WILLIAM D. ROBINSON, Respondent, *v.* THE INTERNATIONAL LIFE ASSURANCE SOCIETY OF LONDON, Appellant.

The authority of an agent in the State of Virginia, appointed by the general agents and local board of directors in the city of New York, of a foreign (London) insurance company, was not revoked or suspended by the existence of the state of war arising from the rebellion of the Southern States.

The receipt of confederate money by such agent, in payment of premiums, was good payment and binding upon the corporation.

(Argued January 8th, 1870; decided March 17th, 1870.)

APPEAL from a judgment entered on the decision of the General Term of the Supreme Court of the first district, affirming a judgment entered upon a verdict for plaintiff, for $13,373.26.

This is an action upon a policy of life insurance, issued by the defendant upon the life of Cunningham Wardrop Macmurdo, during his lifetime a resident of Richmond, Virginia. The plaintiff brings the action as assignee of John R. Macmurdo, the administrator of C. W. Macmurdo. The defendant is an English corporation, incorporated in the year 1837, under an act of parliament, by the title of the National Loan Fund Life Assurance Society (a title changed to its present title by act of parliament, in the year 1855), and doing business in this State as a foreign insurance company, under the general laws relating to such companies, and in the State of Virginia, under the laws of that State.

The business of the company in the United States was carried on by two general agents, C. E. Habicht and J. G. Holbrooke, and a local board of directors, all appointed by and removable by the English board.

The policy in question was issued by the defendant to C. W. Macmurdo, on the 8th day of December, 1845. By its terms it was provided that the company should pay "within three calendar months next after proof satisfactory to the directors of the said society shall have been received at the office of the said society, of the death of the said assured, unto his executors, administrators or assigns, the sum of $10,000, together with such further sum or sums, if any, as shall have been assigned to or in respect of this policy, pursuant to the rules and regulations for the time being of said society, or as by way of bonus or in addition to the sum hereby assured."

By the terms of the instrument it was further provided, that "the policy and assurance hereby effected are and shall be subject and liable to the several conditions, restrictions and stipulations hereupon indorsed, so far as the same are or shall be applicable," one of which is as follows: "Conditions of the assurance policies, whether the premiums be payable yearly, half-yearly, quarterly, or in any other manner than by a single payment, will not be considered in force if the

premiums remain unpaid beyond thirty days after becoming due."

The only position which the defendant attempted to sustain at the trial was, that the policy had been forfeited because there was no sufficient payment of the renewal premium which fell due after the 8th day of June, 1861.

It was admitted in the pleadings that all the premiums had been regularly and duly paid up to and including that which fell due on the 8th day of June, 1861.

It appeared in evidence that, in the spring of 1858, W. L. Cowardin was duly appointed the defendant's agent at the city of Richmond ; that such agency was not revoked by any act of the defendant until the year 1865, and that as such agent it was his duty to receive proposals for life risks, and to renew existing and accepted risks, and that during the period from 1858 to 1865, he received a large number of renewal premiums from numerous persons.

Prior to June, 1861, his general habit, occasionally departed from, however, had been to give the persons making such payments, as their vouchers, renewal receipts, signed by the general agents in New York, and forwarded to him from that place.  He credited the defendant with the premiums received, and paid them by draft on New York.

There was no revocation of Cowardin's authority, *by any act of the defendant*, until the year 1865.

From the time of Cowardin's appointment up to and including the 8th day of June, 1861, C. W. Macmurdo paid his renewal premiums regularly to Cowardin.  The payment of the 8th of June, 1861, was made after the breaking out of the rebellion, after actual war was inaugurated, and a receipt signed by Cowardin, and not by the general agents, was given to Macmurdo.

These payments, including that of June 8th, 1861, are all admitted, by the answer, to have been valid payments.

After June, 1861, up to the time of Macmurdo's death, in October, 1862, he continued to pay his premiums regularly, to Cowardin, and paid them in confederate money.  This

had been issued by the confederate government prior to June, 1861, was the only money in general circulation at that time in the south, and was received by Cowardin without objection, and receipts for the premiums, signed by him as agent of the company, given to Macmurdo.

It further appeared, that on the 26th of June, 1861, Cowardin wrote a letter to the general agents in New York, inclosing an account of his agency, and stating the payment of renewal premiums by Macmurdo and others.

This letter was received by the general agents on the 7th of July, 1861, after the existence of open hostilities, and after the general agents were aware of the issuing of confederate money.

The renewal premiums, appearing in their account, were, nevertheless, posted as having been duly paid, in the books of the company.

The plaintiff further gave evidence, by Willis and Cowardin, that in the latter part of July, 1861, Mr. Holbrooke, one of the general agents, gave explicit instructions to Cowardin, through Mr. Willis, to receive the premiums, and hold them subject to his (Mr. Holbrooke's) order.

In February, 1863, after Macmurdo's death, Cowardin wrote to the directors of the company in London, stating the circumstances of his death, and advising prompt payment of the claim, and also giving an account of his agency, and stating the amount of confederate money in his hands, received for premiums. This letter reached the company in April or May, 1863, but no intimation was given until some time in 1865, to any one, that his acts were not recognized by the company.

The claim of Macmurdo's administrator was presented at the same time as Cowardin's letter, and no objection was then taken on the ground of want of authority in Cowardin, or on the ground of the payment in confederate money.

In January, 1866, the general agents directed the insertion of an advertisement in the Richmond newspapers, that the company " *have* no business agent *at present* in Richmond."

There was no contradiction of any portion of this testi mony, except with respect to the alleged instructions to Willis, in July, 1861, testified to by both Willis and Cowardin, with respect to which Holbrooke only said that *he did not remember* giving such instructions.

The question as to whether such instructions had been given was submitted to the jury by the judge who tried the cause, and he further instructed them that, if they believed that the general agent gave the direction and authority testified to by Willis, the plaintiff was entitled to recover.

The defendant presented numerous requests to charge, some of which the court charged as requested, and refused others, to which the defendant excepted, which are considered in the opinion of the court.

The jury found a verdict for the plaintiff and judgment was thereupon duly entered in his favor, from which judgment the defendant appealed to the General Term of the Supreme Court.   The General Term affirmed this judgment, and the defendant thereupon appealed from the judgment of the General Term to this court.

*James W. Gerard, Jr.*, for the appellant, insisted that a foreign corporation coming within this State, by its officers and board of directors, may have a domicil here, citing *The Portland* (3 Chr. Rob., 42); *The Jonge Klassina* (5 Chr. Rob., 302); *The Ann* (1 Dodson, 221); *The Antonio Joanna* (1 Wheat., 159); *Elbers* v. *United Ins. Co.* (16 Johns., 128); Phillips on Ins., 112, § 164; *The Society, &c.* v. *Wheeler* (2 Gall., 105, 131); *The People* v. *Cent. R. R. of N. J.* (48 Barb., 478); 1 Duer on Ins., 525, 527.   That the defendant being thus domiciled here, and its *status* that of an enemy, as to the inhabitants of the hostile confederacy, it was illegal to conduct any transactions with the public enemy, citing 2 Law. Wheaton, 559, 569, part iv., chap. 1; *McConnell* v. *Hector* (1 Bos. & Pull., 113); 1 Duer on Ins., 495; *The Harmony* (2 Chr. Rob., 322); 1 Kent, pp. 85 to 88, 10th ed.; *The Indian Chief* (3 Chr. Rob., R., 12, 22); *The Citto* (3 id.,

38); *The Venus* (8 Cranch, 253); *Livingston* v. *Maryland Ins. Co.* (7 Cranch, 542); *The Frances* (8 Cranch, 363); *Beebe* v. *Johnson* (19 Wend., 500); *The President* (5 Chr. Rob., 277); *The Venice* (2 Wall., 275); *The Friendschaft* (4 Wheat., 105); *The Rendsborg* (4 Ch. Rob., 140); *The Vigilantia* (1 Chr. Rob., 15); *The San José* (2 Gallison, 268). That the open state of war was notice of revocation of the agency, citing *Carver* v. *Lane* (1 E. D. Smith, 165); Lawrence's Wheaton, page 557, note; Stor. on Agency, page 593, §§ 481, 484. That all contracts became suspended, and the derivative powers of agents ceased, citing *The Julia* (8 Cranch, 181); *The Rapid* (8 Cranch, 161); *Griswold* v. *Waddington* (15 Johns., 57; 16 id., 438); *The William Bagaly* (5 Wall., 407); *Honger* v. *Abbot* (6 Wall., 534); *Jecker* v. *Montgomery* (18 How., 110); *Esposito* v. *Bowden* (7 Ell. & Bl., 788); *a fortiori* as to contracts of insurance; 1 Duer on Ins., 417; 3 Kent, 255; 1 Phillips on Ins., 3d ed., page 104, § 149; *Furtado* v. *Rogers* (3 Bos. & Pul., 191); *Kellner* v. *LaMesurier* (4 East, 396); *Gamba* v. *LaMesurier* (4 East, 407); *Brandon* v. *Curling* (4 East, 410). Even if defendant had no domicil here, the contract was illegal. *Bank of Augusta* v. *Earle*, (13 Peters, 519); *Baird* v. *Poole* (12 N. Y., 495); *New Hope Co.* v. *Penn. Silk Co.* (25 Wend., 648); *Kennett* v. *Chambers* (14 How., 39); *Honger* v. *Abbot* (6 Wall., 534.) He also insisted that the agent had no authority to receive anything but "money," citing *Wilson* v. *Genesee Ins. Co.* (14 N. Y., 418); *Matthews* v. *Hamilton* (23 Ill., 470); *Todd* v. *Reid* (4 Barn. & Ald., 210); *Russell* v. *Bagley* (id., 395); Dunlap's Agency, 280, 281; *Partridge* v. *Bank of England* (58 E. Com. Law., 9 Adol. & El., N. S., 396); *Grant* v. *Norway* (73 C. B., 665); *Ontario Bank* v. *Lightbody* (13 Wend., 101). And that confederate notes were not money, citing *Clark* v. *Metropolitan Bank* (3 Duer, 241); Const. of the U. S., art. 1, § 10; *Wright* v. *Overall* (2 Coldwell, Tenn., 345); *Craig* v. *The State of Missouri* (4 Peters, 410), *Briscoe* v. *Bank of Kentucky* (11 Peters, 258).

*Edmund Randolph Robinson*, for the respondent, on the point that the war did not revoke or impair the authority of the agent, cited *Griswold* v. *Waddington* (15 John., 69); *Clark* v. *Morey* (10 John., 69); *Bell* v. *Chapman* (id., 183); *Conn.* v. *Penn.* (1 Wash. Cir. Ct. R., 524); *Dennistoun* v. *Imbrie* (3 Wash. Cir. Ct. R., 396); *Buchanan* v. *Carey* (19 John., 136); *Baltimore & O. R. R. Co.* v. *Glenn* (28 Maryland); *Ludlow* v. *Brown* (1 Johns., 1); *De Wolf* v. *Firemens' Ins. Co.* (20 John., 214); affd. 2 Cowen, 56. As to the validity of the payment in confederate money, he cited *Buckbee* v. *Ins. Co.* (18 Barb., 541); *Ruse* v. *Ins. Co.* (26 Barb., 556); *Baker* v. *Ins. Co.* (6 Abb. Pr. R., 144); *Green* v. *Sizer* (40 Miss., 530); *Murrell* v. *Jones* (id., 565); *Phillips* v. *Hooker* (Phill. No. Carolina Eq. R., 193); S. C., 7 Am. Law Reg., N. S., 40; *Turley* v. *Nowell* (Phill. N. C. Eq. R., 301); *Henley* v. *Franklin* (3 Coldwell, Tenn., 472); *Brown* v. *Wylie* (2 West Virginia R., 509); *Abbott* v. *Dermott* (34 Georgia, 227); *Thorington* v. *Smith & Hartley* in Sup. Ct. of the United States, Nov., 1869.

Hunt, J.  The policy, on which this action is brought, was issued by "The National Loan Fund Life Assurance Society," 26 Cornhill, London.  Cowardin was regularly appointed the agent of that society to receive the premiums paid annually or quarterly at Richmond, Va., by persons to whom policies were issued.  He was thus appointed by the New York board in 1858, and continued to act as such agent until the year 1865.  There was no actual revocation of his powers until the spring of that year.

The defendant is an incorporation, organized under the authority of the British parliament, for the purpose of making insurance upon the lives of individuals.  To carry on this business in the United States, it established an agency in the city of New York, of which Mr. Holbrook and Mr. Habricht were the chief managers.  They were assisted by certain other persons, residents of the city of New York, and together formed a board of directors, exercising substan-

tially all the powers of the company in this locality. They issued policies and paid losses and appointed agents upon their own motion. They exercised all the powers that agents could well exercise, and, it may be assumed, without control or interference by the directors in England. They were general agents intrusted with unlimited authority. It is important to observe that the New York board were but agents, however general their character or unlimited their authority. The principal was the company itself, in England. That principal could at any moment have revoked the powers of these New York agents, so far as the agents themselves were concerned, and assumed all its original authority.

Macmurdo obtained his policy of life insurance in the year 1845. He paid his premiums quarterly to the agent of the company in Richmond, Cowardin being such agent after 1858, appointed by the New York board. The premium thus paid to Cowardin in June, 1861, is admitted by the company. Its validity is not questioned either on account of the existence, at that time, of a state of war arising from the rebellion, or on account of the currency in which the payment was made.

The first objection of the defendant is this, that the existence of the war after June, 1861, arising from the rebellion of the southern States, revoked, or suspended during the war, the agency of Cowardin, and that his action during that period was null and void. That war then existed in this country cannot be doubted. "When portions of the citizens of a civil government have rebelled, have established another government, resorted to arms to maintain it, and the rebellion is of such magnitude that the military and naval forces of the government have been called out to suppress it, they are to be regarded as belligerents. To create belligerent rights, it is not necessary that there should be war between separate and independent powers. They may exist between the parties to a civil war. * * * A civil war exists whenever the regular course of justice is interrupted by revolt,

rebellion or insurrection, so that the courts cannot be kept open." (*Swinton* v. *Col. Ins. Co.*, 37 N. Y., 178; "*Prize Cases*," 2 Black. R., 667, 668.)

It is far from certain that, if the residence of the defendant had been in the city of New York, the existence of war would have vacated or suspended the authority of Cowardin. A power of attorney to collect a debt, or to receive money, seems to continue valid, although the principal resides in an enemy's country. (*Clark* v. *Morey*, 10 John. R., 73; *Griswold* v. *Waddington*, 15 id., 64, 68; *Buchanan* v. *Carey* 19 J. R., 137; *Conn.* v. *Penn.*, 1 Peters' R., 496; *Dennistoun* v. *Imbrie*, 3 Wash. C. C. R., 396). It is not necessary to pass upon this point, as the principal in this contract was in no sense a resident of the State or city of New York. The defendant was a British incorporation, organized by virtue of an act of parliament, carrying on its business in London, as its home office, and doing business also in this State, strictly and professedly as a foreign corporation. Whether its business here is transacted by one agent or many, and whether such agent has extended or restricted authority, can have no effect upon the domicil of the company. Residence and agency have no connection with each other.

If it is conceded that a contract of insurance by a citizen of this State, upon the life of a citizen of Virginia, in the year 1862, would have been avoided or suspended on the ground that the condition of war will not permit such contracts between the citizens of States at war with each other, we do not then reach the case before us. This was a contract between a citizen of a neutral country and a citizen of a belligerent country. No authority is adduced to sustain the proposition, that this state of things annuls or suspends a power of attorney to receive premiums on a policy of insurance. It is supposed that no such authority can be cited, but that the law is to the contrary. (*Ludlow* v. *Bowne*, 1 John. R., 1; *De Wolf* v. *Firemen's Ins. Co.*, 20 J. R., 214; Affd. 2, Cow. 56.)

The argument of the appellant's counsel throughout, is

based upon the idea that the *status* of the insured and of the defendants, in a legal and actual sense, was that of enemies. He argues thence, that all commercial and other intercourse and business transactions became illegal and void, and that the powers of all agents, to make or continue such contracts, ceased. The fact assumed does not exist in the present case. The *status* of the defendant was simply that of a neutral, contracting or continuing a contract with a citizen of a belligerent country. Such contracts are valid by the laws of all countries, and goods to be delivered under such contracts are exempt from seizure by hostile cruisers, except when they are articles contraband of war. (*Auth. sup.*)

The question of authority must also be considered as disposed of by two other considerations. 1. The jury found that the general agents in New York had given express authority, in July, 1861, to Cowardin to continue to receive premiums, and to hold the same subject to the order of the New York agents. Willis testified that Mr. Holbrooke gave such directions to him, to be communicated to Cowardin, and that he did so communicate. Cowardin testifies that he received and acted upon such authority. Holbrooke scarcely denies it, but the judge submitted the question to the jury, who found in favor of the authority. 2. In February, 1863, Cowardin informed the company in London of all his transactions, including the Macmurdo case. The company made no objections to any of his transactions, or to his mode of doing business.

Under such circumstances, the authority of Cowardin to receive payment for the company, and its binding obligation upon them, are scarcely open to argument.

The appellant's counsel further insists that Cowardin had no authority to receive payment of the premiums in "confederate money," and that the payment in that medium was in no legal sense a payment of such premiums.

It appeared from the evidence, that Cowardin had, from the outset of his agency, received payment of all the premiums paid by fifty or sixty different persons, in the currency of the

country; that, as received, he deposited the same to his own credit in the bank, and at stated periods, after deducting his commissions, remitted the balance to the directors in New York by a draft payable there. He continued this practice in 1861 and 1862, as to the manner of receiving payments. The communications between New York and Richmond, for all business purposes, were entirely cut off; no remittances could therefore be made at that time. It appeared that the confederate currency began to be issued in July, August and September, 1861. At the date last named, it was equal in value to the circulating bank notes of Virginia, and about five per cent below gold, and it soon became the almost exclusive circulating medium of the country. It is contended that this circulation was not money, for the reason that it was issued by a rebel government, that it had no legal validity, that it was no better payment than if counterfeit money had been received by Cowardin. This question must be decided upon the condition of things as they were and as they appeared in 1861 and 1862, and not as we find them now, in 1870.

The year 1861 had brought many triumphs to the armies of the rebellion. It had brought defeat to the forces of the government, mortification to its citizens. The disastrous battle of the first Bull Run had occurred in July. The surrender of General Twiggs was in the same month. The defeat at Wilson's creek and the death of General Lyon had taken place in August. The month of October had witnessed the capture of Mason and Slidell, with the approbation of Congress and of the people. A little time farther witnessed their unconditional surrender and return to a British vessel, upon the imperious and unceremonious demand of the British government. The same month of October was marked by the disastrous defeat of Ball's Bluff. In May, 1862, General Banks was driven from the valley of the Shenandoah. In May and June, the disasters of McClellan before Richmond, resulted in his retreat to Harrison's Landing. The second Bull Run and the invasion of Maryland by General Lee

occurred soon after. Happily these reverses did not accomplish the overthrow of the government. The subsequent success of the Union armies, under Grant, Sherman, Thomas, Sheridan, and others, overthrew the rebellion and established the government on a firm basis. This was not, however, effected until the spring of 1865, and so late as the summer of 1863, the armies of the rebellion were able to make a victorious incursion into the State of Pennsylvania.

In addition to this general summary, it is to be remembered that it is proved in this case that up to September, 1861, this currency was equal in value to the bank notes in circulation in Virginia; that it was but five per cent below gold, and that at a still later period it was but sixteen per cent below gold. Let it be observed, also, that our own circulating currency was so depressed that at some periods of the war one hundred in gold would buy two hundred and ninety in currency. In January of the present year, five years after the restoration of peace, the national bank currency in circulation by authority of the United States laws, and the legal tender notes of the United States, were at a discount from the standard of gold of more than twenty per cent. Under such circumstances it is quite unreasonable to say that Cowardin had no authority to receive the payment, in confederate money, of the premiums due to the company, and that it was no better than counterfeit money. It was a currency issued by the authority of an existing, *de facto* government, which had adopted a constitutional form of government and was fully organized under it, which had in the field large armies, had won many battles, had invaded the States of the north, had besieged the national capital, was recognized as a belligerent power soon after by the British government, and which had, from the outset, been treated as a belligerent by the government of the United States, and which was itself confident of maintaining its existence. It is true that these notes are now valuable only as relics of a past existence. It was, however, nearly four years after the occurrences we are considering before this result became certain,

and we cannot transport our knowledge backwards, and by its use condemn, as base and worthless, a currency which was then in general use and might become permanently valuable.

It is not necessary for us to go so far as the Supreme Court of the United States have gone, in the recent case of *Thor ington* v. *Smith & Hartly*. The present is the case of an executed contract, in which the parties acted upon the state of things as they existed. They were compelled so to act or not to act at all. The action is past and ended. The rights of the parties were fixed and settled, years ago, and we are called upon, by this defence, to unsettle and destroy them. In the case of a debt paid, or property sold and paid for in confederate money, it would be unreasonable to call upon the courts to rip up the transaction and compel the repayment of the money. The requests to charge, which were refused by the judge, were based upon the theories which I have discussed, and if I am right in my views, the refusals were properly made.

Judgment should be affirmed.

All concurred with Hunt, J., for affirmance, except Suth-erland, J., who did not vote.

Judgment affirmed.

Note.—The case of *Thorington* v. *Smith*, in the Supreme Court of the United States, cited by respondent's counsel and referred to in the opinion of Hunt, J., will be found reported in 8 Wall., 1.

It was decided at the December Term, 1868, Chief Justice Chase delivering the opinion of the court.

As to the power of a corporation to have a domicil in any other State than that under whose laws it was created, see *Merrick* v. *Van Santvoord* (34 N. Y., 208); *Stevens* v. *Insurance Company* (41 N. Y., 149).—Rep.