JUDGE ROBERTSON
delivered the opinion oe the court.
By a policy executed March 13,1858, the appellant insured the life of James C. Clopton, a minister of the gospel, resident near Lynchburg, Ya. The provisions of the policy, so far as material now, are the following:
“ The New York Life Insurance Company, in consideration of the sum of $181.50, to them in hand paid by Mary A. Clopton for the benefit of herself and children, and the annual premium of $181.50, to be paid on the 13th day of March in every year during the continuance of this policy, do assure the life of James C. Clopton, for the sole use of Mary Ann Clopton and childi’en, in the amount of five thousand dollars, for the term of his natural life, commencing on the 13th of March, 1858, at noon; provided always that it is hereby declared to be the true intent and meaning of this policy, and the same is accepted by the assured upon these express conditions : in case the said Mary A. Clopton shall not pay the said premiums on or before the several days hereinafter mentioned for the payment thereof, then and in every such case the company shall not be liable to the payment of the sum insured, or any part thereof; and this policy shall cease and determine.”
*183 James C. Clopton died in May, 1864, after paying all the premiums payable before the 13th of March, 1862, but not actually paying the premiums for 1862, ’63, '64.
Mrs. Clopton and her children brought this action for the amount of the insurance, after deducting the three unpaid premiums, which the appellant's agent, A. jB. Garland, still residing in Virginia, and who received all the other premiums, refused to accept.
The answer resisted the action on two grounds: 1. That the civil war dissolved the contract; 2. That the non-payment of the three last premiums avoided the policy. On the double issue thus joined the circuit court, to whom the law and the facts were submitted, after deducting from the five thousand dollars the aggregate of the unpaid premiums, adjudged to the appellees the balance with legal interest from the date of the demand and refusal to pay.
A reversal is sought on each of those grounds, urged with signal ingenuity and great ability; but cogent as the argument is felt to be on assumed analogies, plausible generalities, and indiscriminating dieta, a close analysis of principle, policy, and judicial authority inclines us to concur with the circuit court in its judgment, though not for precisely the same reasons.
The two controlling questions will, as briefly as perspicuity will allow, be now considered in the order in which they have been presented.
Although there is neither proof nor any presumption that either James C. Clopton or the appellees or Garland by any voluntary act helped to incite or prosecute the rebellion against the General Government, or in any way participated as an actual belligerent in the strife between the hostile sections, yet their residence in the southern section made them and the appellant technical enemies; and the established law of such internecine war interdicted all commercial intercourse between such antagonist parties, and consequently any com *184 marcial contract or payment made between them during the war would have been unlawful and void. The same principle and policy of the law did not avoid a pre-existing and valid contract which a single act, such as payment of a debt, might have performed. In such cases a suspension of remedy during the war was the consistent and only legitimate effect of the war on such contracts. But both principle and policy would have dissolved a contract made before the war for “ continuing performance ,” such as partnership or affreightment. Dissolution is the natural and necessary effect of a change so radical in the status, rights, and duties of such parties.
The appellant’s counsel urge the application of this last-doctrine to this case, insisting that the war revoked Garland’s agency, and also that the contract was one of continuing performance, and therefore was dissolved and not merely suspended. We do not see the law in that light.
Where a single act, such as payment of a debt, would perform a contract made before the war, belligerent policy interdicted the act because it might aid the enemy in the prosecution of hostilities; consequently suspension of performance until the restoration of peace would effectuate the whole aim of the law without dissolving the contract, which may be ultimately enforced in perfect consistency with the principle and end of the temporary interdict. In that class of cases it is the contract and not the performance that is continuing; and a suspension of remedy and not a dissolution of the contract is all that is necessary, befitting, or just.
■ But in such cases as partnerships and affreightments the performance is continuous and unremitting until the end of the contract shall have been consummated; and therefore, as supervening war between the parties disables them from performing any of the incumbent duties and defeats the object, of the contract, a dissolution of the contract is the natural and legal effect of the war. And that illustrates “ continuing *185 performance,” and the contradistinctive reason for dissolving the contract instead of suspending the remedy in that class of cases. The duties of partners to each other, while the relation subsists, are amicable and incessant. A war which puts them in a state of hostile antagonism disrupts their business relations, and incapacitates them to perform their duties to each other. Such a change is itself, in fact and in law, a dissolution.
In like manner the performance of a contract of affreightment being amicable and incessant from the commencement to the completion of the transportation, a war which makes it contraband, and thereby frustrates its object, necessarily destroys the legal obligation of the contract, and the law can not substitute another to be performed after the close of the war. But the reason for dissolution in those two classes of eases seems to be inapplicable to contracts which may be performed by a single act, or by periodical acts between which there is nothing to perform, and consequently no continuity of performance.
Between a single act and such periodical acts there is no apparent difference in reason or principle. Therefore the law which onfy suspends the remedy in the one case can not consistently dissolve the contract in the other.
According to this definition, the ordinary contract of insurance does not seem to belong to the class of contracts of “ continuing performance.” Insurance is a contract sui generis, governed by a peculiar and rather an arbitrary code of the modern common law, but recently molded, and not yet stamped in all respects with conclusive authority. Its character, however, is so far matured and established as to distinguish it essentially from ordinary commercial contracts, and especially in the effect of war on its pre-existing validity, which the war as a general rule destroys, whether the contract belong to the category of “ continuing performance ” or not.
*186 In the case of Leathers v. The Commercial Insurance Co. of Cincinnati, 2 Bush, this court without special consideration inadvertently illustrated by “partnership and insurance” contracts of “continuing performance.” Affreightment would have been more appropriate than insurance. But that inapposite suggestion was immaterial, and as the case was properly adjudged on another and the only judicial point, the obiter inadvertence is entitled to no consideration in this case. And we now consider insurance as a contract not dissoluble as of “ continuing performance,” but on another ground, to be presently considered, and which would sustain our judgment in the case, supra, even if the risk had continued until after the inauguration of the war.
In this case the insurance was an executed entirety for the prescribed “term,” and the only performance which could devolve on the underwriter was to pay the stipulated amount of five thousand dollars in the event of loss insured against, fulfillment of which was not a continuing act, but a single act of a continuing contract. And the consideration, though payable in annual installments, was yet an entirety also; and, as already suggested, full performance was not as defined of that kind technically styled continuing. Consequently the war did not dissolve the contract on any such ground as that on which it would have dissolved a contract of partnership or affreightment. But as a general rule war may dissolve an insurance when it would only suspend legal remedy on ordinary commercial contracts not of continuing performance; and this is the most distinctive difference between a policy and other contracts. The only philosophical or authoritative reason for this distinction is the impolicy of assured indemnity against the perils to life or to property incident to a state of war between the parties to the contract of insurance; and consequently the principle which avoids such contracts made during the war is lately extended to the interdiction of the contin *187 uance during the war of such as were previously made, and were valid when made.
To illustrate the principle and its application as recognized in England, the following British decisions are here cited: Furtado v. Rogers, 3 Bos. & Pul. 191; Kellner v. Le Mesurier, 4 East. 396; Gamba v. Le Mesurier, 4 East. 407; Brandon v. Curling, 4 East. 410.
In Furtado v. Rogers, Lord Alvanly, C. J., in delivering an elaborate opinion, said that “when a British subject insures against capture the law infers that the contract contains an exception of capture made by the government of his own country.”
In Kellner v. Le Mesurier, Lord Ellenborough said, respecting the effect of a subsequent war on a policy antecedently issued, “that insurance against British capture eo nomine would be illegal and void upon its face, as being directly and obviously repugnant to the interests of the state; and that if such an insurance made, in terms, by a British subject would be void, an insurance indirectly producing the same effect by the application of the general terms of the policy to the particular event of a British capture would be equally illegal.” And the case of Gamba v. Le Mesurier is confirmatory.
In Brandon v. Curling, Lord Ellenborough extended this principle to all insurances of property by interpolating, as implied, the following condition: “Provided that this in-
surance shall not extend to cover any loss happening during the existence of hostilities between the respective countries of the assured and assurer.”
It may be a grave question whether the implied condition as to perils of the war should be extended beyond the belligerent right of capture or destruction by the government of the insurer; and to that extent only we may admit that the continuation of the policy during war would be illegal and its pre-existing obligation become avoided. But the principle of this concession would not avoid a policy insuring property *188 which is exempted by law from the belligerent power; and while it would avoid a policy insuring the life of one who becomes an actual enemy of the government of the insurer, which had the right to destroy that life, it would not affect the validity of an insurance of the life of a neutral or passive non-combatant, over whose life there is no belligerent power; for though the domicile which makes him a technical enemy, whose property may be lawfully captured as enemies’ property, yet as such nominal hostility does not subject his life, like his estate, to peril, no belligerent right is affected by the continued validity of the insurance; and consequently in such a case neither authority nor principle would avoid the policy any more than if it had insured the life of a child in the cradle, or insured property exempt from capture or confiscation. (Keir v. Andrade, 6 Taunt. 504.)
Whatever we may think therefore of the entire case of Brandon v. Curling, we feel satisfied that no allowable construction of the facts or consistent application of the law in the ease we are now adjudging will pei’mit us to decide that the war dissolved the contract of life insurance. Nor can we adjudge that non-payment of the premiums after the inauguration of the war avoided the policy.
However lawful the condition of avoidance as prescribed in this case may be admitted to be, it is in effect a forfeiture which ought not to be favored. To subject to forfeiture all the premiums paid, as well as the five thousand dollars for the loss of life, would be harshly and unreasonably penal for no better cause than the inevitable non-precise payment of another installment of premium, which the law prevented the appellant from, a right to receive. None of the parties can be presumed to have contemplated such disabling war, or to have intended-by the condition of avoidance more than voluntary failure to pay, when there was legal ability to receive the premiums.
*189 Then as, according to principle and consistent authority, the contract was not dissolved by the war, how can this court, consistently with the spirit of the literal condition and the facts of the case, adjudge the policy avoided by the inevitable non-payment of premiums ? Such a decision would seem to be as unreasonable as unjust.
Had it been true, as assumed by the appellant’s learned counsel, that the war totally revoked the "Virginia agency, then there could have been no legal payment unless the domicile of the assured had been removed within the Federal lines, which appellant could not have expected nor reasonably required. On this hypothesis there could have been no avoidance, but postponement only. But on this point the law is more favorable to the appellant; for, as adjudged by the Supreme Court of the United States in Ward v. Smith, 7 Wallace, 452, while the war revoked Garland’s authority to negotiate policies, it did not revoke his power to receive px-emiums for policies previously issued. The xvar did not therefore prevent a legal payment to Garland in Virginia, which consequently would have released the liability of the appellees for the amoxxnt so paid.
But, according to the same case, Garland, had he received, could not have legally paid over to his constituent in New York dxxring the war; and conseqxxently no such payment to Garland could have been available to the appellant otherwise than by looking to the agent as custodiaxx, sxxbject to all hazards, until the close of the war. For that reason, and also because, as he testified, the money, if deposited with him for his constituent, would have been liable to spoliation xxnder an act of confiscation by the Coxxfederate Congress, Garland refused to receive the premium of 1862, which was punctually tendered to him in the local currency of Vix-ginia; but, considering it best for all parties, he substituted a bond for payment with interest at the end of the war. Having, as he *190 also testified, received all the previous premiums iu Virginia currency and paid it over to the appellant without objection, his authority so to receive might be presumed by the assured; and the fact that Virginia was the place of payment might have implied that the currency of that state at the time of payment, however it may then have been changed and depreciated, would have been received by the appellant. But, however this may be, as the appellant could not have lawfully collected the premium, and may have lost it by insolvency or confiscation had it been paid to Garland in money, the tender as made and the substituted bond as executed may be regarded as equivalent to actual payment, and may have been as beneficial to the appellant, and by its security even more so.
The refusal to accept the tender for the year 1862 dispensed with a formal repetition for the years 1863 and 1864; and moreover we may infer from Garland’s testimony that bonds were given for those years also.
On these facts we can not say that the literal non-payment of the three last premiums was either voluntary or prejudicial, or was ascribable even as much to the appellees as to the appellant.
And so understanding the phase of the case and the attitude of the parties, we can not, consistently with the spirit of the contract and equal justice to the parties, adjudge the policy void.
The judgment therefore of the circuit court, seeming right in principle and just in amount, is affirmed.