IN THE

# SUPREME COURT OF JUDICATURE

OF THE

## STATE OF NEW JERSEY,

AT JUNE TERM, 1872.

---

### HENRIETTA HILLYARD ET AL. v. THE MUTUAL BENEFIT LIFE INSURANCE COMPANY.

1. All commercial or amicable intercourse between citizens whose governments are at war is illegal.
2. Contracts made before a war, and which have been partly executed, are not alienated by a war between the governments of the contracting parties, although such contracts be of a continuing character, unless they require acts of intercourse to keep them alive.
3. A stipulation in a policy of life insurance, that the insurance shall be void if the annual premiums shall not be paid at the time designated, does not apply to a contingency occasioned by the act of God, or of the law, rendering such payment impossible.
4. The effect of a war between the governments of the assurer and assured, is to excuse the non-payment of such premiums on the contract days.
5. Such war will have no effect on the continued existence of such life policy.

---

This was a suit on a policy of life insurance, dated December 27th, 1849. The plaintiffs were the daughters of John H. Hillyard, and their respective husbands, and the declara-

415

tion stated that, being interested in the life of their father, they, by one Edwin Hillyard, "their trustee and agent," entered into an agreement with the defendants, in and by which said agreement it is recited that the said defendants, in consideration of the sum of $302.50, to them in hand paid by Edwin Hillyard, trustee, and to the annual premium of $302.50, to be paid on or before twevle o'clock M., on the 27th day of December, in every year during the continuance of that policy, do assure the life of John H. Hillyard, of Richmond, in the county of Henrico, State of Virginia, (meaning thereby the father of the last-named plaintiffs,) in the amount of $5000, for the term of life, &c.

Among the conditons expressed in the policy was the following one, viz.: "That in case the said Edward Hillyard, trustee, should not pay the said annual premiums on or before the several days therein before mentioned for the payment thereof, then and in every such case the said company should not be liable to the payment of the sum insured, or any part thereof, and that the policy should cease and determine; and that it was thereby further agreed that in every such case where the policy should cease and become null and void, the previous payments made therein, and all profits, should be forfeited to the said company."

It was then stated that the trustee paid the annual premiums "up to and until" the 26th day of December, 1861; that for a long time before and after that date, the plaintiffs and the said trustee were inhabitants of Virginia, and the defendants were inhabitants of the State of New Jersey, and that on the 1st day of December, 1861, the President of the United States, by virtue of the power and authority in him vested, and according to the statute, &c., had, by his proclamation, bearing date, &c., declared that the inhabitants of the said state, as aforesaid inhabited by the said plaintiffs and their said trustee, and the section or part of the said state so inhabited by them, were in a state of insurrection against the United States. And that the said proclamation remained in force. and the state of insurrection and condition

Hillyard et al. v. Mutual Benefit Life Insurance Co.

of hostility therein declared to exist, continued for a long space of time, &c., by reason whereby all commercial intercourse, &c., continued to be unlawful and impossible, and during all that time hindered the payment of said annual premiums.

The declaration then alleged a tender after the war.

There was a general demurrer to their declaration.

Argued at February Term, 1872, before BEASLEY, CHIEF JUSTICE, and Justices SCUDDER and VAN SYCKEL.

For plaintiffs, *J. Dixon, Jr.*

For defendants, *F. H. Teese.*

The opinion of the court was delivered by

BEASLEY, CHIEF JUSTICE. This suit is on a policy of life insurance made by the defendants, a corporation created by the laws of this state, in favor of the plaintiffs, who were residents of the State of Virginia ; the person whose life was insured was also a resident of this latter state. The payments of the annual premiums were intermitted during the recent civil war, and the life insured terminated during such intermission. The policy contained the usual clause, that in case the annual premiums should not be paid on or before the days designated, the company should not be liable to the payment of the sum insured, and that the policy should cease and determine. It was this last provision which gave rise to the first objection of the present action, taken on the argument before the court.

The declaration admits that the premiums were not paid according to the terms of this stipulation, and that the death occurred during the period of such non-payment. The existence of the civil war is relied upon as an excuse for this default.

No one can doubt, at the present day, that a war, either foreign or domestic, puts an end, during its continuance, to

all amicable intercourse between the citizens of the respective belligerent powers. In this respect all judicial decisions, as well in England as in this country, agree with the opinions expressed by the publicists, and with the practice of all civilized nations. The interdiction extends to every species of friendly communication. All contracts made with an enemy during war are void, and all payments of debts or remission of funds, under similar circumstances, are illegal and forbidden. As the doctrine is expressed by the English jurists, there cannot exist, at the same time, a war for arms and a peace for commerce; the principle being that the belligerent condition places every individual of the respective governments, as well as the governments themselves, in a state of hostility.

· By force of this rule, the payment of these premiums at the stipulated times became legally impossible. If they had been tendered, the defendants could not, without doing an unlawful act, have received them. Both the payment and the receipt of moneys would have been a breach of duty and of law. The question is, whether the act of payment, having become thus illegal, the performance of such act was not excused.

The exact performance of the contract on the part of the assured, has been rendered impossible by the act of the law, and as such occurrence was not a contingency which can reasonably be supposed to have been within the contemplation of the contracting parties at the time they bargained, I think this failure, in a strict compliance, is not a legal breach of the agreement. The reasonable and true doctrine seems to be, that express terms are necessary to create an obligation, which will include a liability in case of an unanticipated prevention by the act of God, or of the law, of a fulfillment of a stipulation. In the absence of such an expressed intention, there is always an implied understanding that the doing of the act agreed to be done shall not become absolutely impracticable from a remote and unexpected event, occasioned by a natural or legal agency. This rule, as well as its conditions and limitations, is clearly marked in the judicial decisions;

and, as an ancient illustration, I refer to the case of *Lawrence* v. *Twentiman*, 1 *Roll. Ab.* 450, *Condition G, pl.* 10, where it was ruled that if a man covenant to build a house before a certain day, and the plague breaks out in the place where the house is to be built, before the day, and continues till after the day, the covenanter is excused from the performance of the covenant at the day, for the law, it is said, will not compel him to venture his life, but he may do it after. Another example occurs in *Williams* v. *Lloyd, W. Jones' R.* 179, in which the declaration stated that the plaintiff delivered a horse to the defendant, which the defendant promised to re-deliver on request, and a defence was sustained which set up that the horse died before a request re-deliver him. *Lord Coke,* 1 *Inst.* 216, *a, b,* expresses the same rule, saying: "That where a condition of a bond or recognizance becomes impossible by the act of God, or of the law, or of the obligee, there the obligation is saved, as if a man be bound by recognizance or bond, with condition that he appear at the next term of such court, and before the day he dieth, the recognizance or obligation is saved." This rule, as thus expounded, was applied and enforced by the Supreme Court of New York, in the case of *The People* v. *Manning & Condit,* 8 *Cow.* 297, and its existence is very pointedly recognized by Lord Ellenborough in *Barker* v. *Hodson,* 3 *M. & S.* 271. The doctrine was much considered and discussed in the modern case of *Hall* v. *Wight, El., B., & El.* 746, (96 *E. C. L. R.,*) which was an action for breach of promise of marriage, and in the several opinions read in the case, it seems to be expressly stated or impliedly assumed, that if the performance of the promise had become impossible by the act of God, as by a visitation of grievous sickness, it would have been an excuse for non-performance. It is true that in judicial dicta and in the works of some of the text writers, it is affirmed as a general rule or principle of law, that whenever a party enters into some unqualified agreement to do some particular act, that the impossibility of performance occasioned by inevitable accident, or an unforseen occurrence over which he had

no control, will not release him from his contract. Mr. Addison, in his Treatise of Contracts, thus declares the law, but an examination of the cases cited will show that the deduction made by him is not warranted; the examples adduced are all cases of difficulty, and not of impossibility of performance. This erroneous statement of the rule—erroneous on account of its universality—seems to have proceeded from the leading case of *Parradine* v. *Jayne, Allyn* 26 in which the distinction is drawn between such duties as the law charges upon a party and those which he voluntarily assumes, the difference being that it is only in the former class of cases that non performance will be excused when it arises from inevitable necessity. The reason given for this discrimination is, that in instances of self-assumed obligations, provisions should be made for the contingency set up as an excuse for non-compliance with the express stipulation. The rule in the case cited is expressed in too general terms, but limiting it, as it should be limited, by its application to the facts to which it belongs, it is correct, The action was in debt for rent, and the defendant pleaded that he had been expelled from the premises demised and from the profits, by the public enemy. Obviously, this was not a case of impossibility of performance, for it was simply a hardship for the tenant to pay rent when no benefit had accrued to him from the property. There could be no reasonable inference from the conditions of the case that the parties intended that the rent was not to be exacted in the event of the possession of the premises being lost to the tenant. Whether a contract is to be operative in the event of performance becoming impossible, is a question as to the intention of the parties.

There are few contracts, if any, which express, in terms, the full meaning of the contractors under all possible circumstances, and hence the limitations and incidents which the law so often supplies. It is not intended to be questioned that when a contract is made in intelligible terms, which are sufficiently specified, the law will neither add to nor take anything from it; but when general terms only are used, and

remote contingencies arise, rendering a strict compliance impossible, it then becomes obvious that to give full effect to such general terms would often be to lend them a force which might lead to injustice and to results quite aside from what was contemplated. For example, if a man promise, in an unqualified form, that he will write a certain treatise or paint a certain picture within a given time, it would hardly be claimed that his death, before the lapse of the period, would not excuse his non-compliance with the very terms of his agreement. This limitation of the language used would be deduced from the nature of the undertaking, which required for its performance the personal service of the promisee, and from the consequently well-founded inference that it could not have been intended to regard the contract as broken if death intervened. Such promise is unconditional and absolute, but its generality is restrained by an implication which belongs to the very substance of the transaction. On the other hand, as an illustration of the opposite class of cases, when a tenant agrees, in an unrestricted form, to pay a certain rent, he will not be released by a destruction of the premises from natural causes, the reason being that such casuality is not unusual, and was probably within the contemplation of the contracting parties, and performance, though a hardship, is not impracticable. The distinction is, I think, a plain one, and establishes a rule which is indispensible, if courts are to enforce the real design and will of those who impose duties upon each other through the medium of agreements. It is so seldom that persons would be willing to bind themselves for the consequences of a breach of contract occasioned by the act of God or that of the law, that it is safe to lay down the rule that such an obligation will not be deduced from general terms, but that a specific stipulation is necessary to produce such a result.

A strong case in favor of controlling a stipulation couched in general language, is afforded by the decision of Lord Ellenborough in *Brandon* v. *Curling*, 4 *East* 417. The suit was on a marine policy, containing the usual clause of indem-

nification against all capture and detention of princes. The vessel had been taken by the government of the underwriter, and the decision was to the effect that the insurance, though general, must be considered as containing an exception against a loss happening during the existence of hostilities between the respective countries of the assured and assurer. I cannot find that it has ever been ruled that if the performance of a promise turns out to be impossible without the fault of the promiser, that the performance will not be excused unless the contract, in express and specific terms, providing for the event occasioning the impossibility. Applying this rule to the facts now under judgment, I conclude that the intermission of these payments was excused on the force of necessity, and because the parties did not contemplate the occurrence of such necessity, and, consequently, did not provide for it. It is very unreasonable to infer that it was the intention that a forfeiture should be incurred if the insured, by no fault of his, but from the intervention of the law, failed to fulfill his contract with respect to punctuality of payment. According to the view of the defendants, and regarding this stipulation as unqualified, if the insured, on one of the days for annual payment, being on his way to settle the premium, had been taken with a sudden sickness, and had remained in a state of insensibility until the time for payment had passed, all his interest in that policy would have been irretrievably forfeited. So unreasonable a force should not be given to this provision. In my opinion the payment of these several premiums on the contract day was excused, from the fact that such payment was rendered impossible by the war. The true meaning of the agreement, read in the light of its necessary implications, is, that the premiums were to be paid at the time specified, unless prevented by the act of God or of the law. A legal interdict was temporarily imposed on such payments, and the effect was to suspend the obligation to pay; but such suspensions did not affect the obligations of the defendants. To hold that the liability of the defendants was suspended, would be to declare a forfeiture *pro tanto*.

When the subject matter of the contract does not become unlawful, and it has been, in some degree, executed, so that the parties cannot be restored to their original condition, the contract, although, for the time being, some of its terms are not capable of performance, is not in a posture to be rescinded, either in whole or in part. When such a result is not absolutely inevitable, and when it would lead to injustice, it does not take place. Whenever the law interferes with the contract, it should be held that such interference will disturb the intentions of the contracting parties to the least degree practicable. Judge Washington, in a case in which it was held that an embargo temporarily preventing the performance of a contract, did not destroy its obligations, recognized the principle to which I refer. He says: "Where the rule applies that if the law forbids the performance of a contract in part only, he who is bound by it must still perform what he lawfully may. In the case of an embargo, for example, the ship-owner is disabled from commencing his voyage at the specified time, but he is bound to go when the prohibition is removed. A strict performance is prevented by the law, and the law excuses it." *Odlin* v. *Insurance Co.*, 2 *Wash. C. C. R.* 317. There can be no question but that it is, in some degree, a hardship on these defendants to have their responsibility kept alive during the time the benefits of the contract were not fully enjoyed by them, but it is to be remembered that whenever the law interferes and ties up a party from performance, some hardship is the inevitable result. Postponements of performance on the one side will generally be injurious to the other. Such results cannot be avoided—they are not uncommon. It has been repeatedly decided that when the payment of a debt is suspended during a war, the interest of the debt is lost to the creditor. Such losses are within the scope of the contracts with which they are connected, construing them by their express terms and their legal implications. In fine, I think the tendering of these premiums was, in legal effect, a compliance with the plaintiffs' stipulation in that respect.

But there is also a narrower ground upon the first point, which will preclude the objection resting on the alleged default of the plaintiffs. It is this: the declaration shows that the defendants, by the interdict of their own government, were disqualified, during the period in question, from receiving the several premiums remaining unpaid. Under such circumstances, it would be strange if the defendants could set up that the plaintiffs had lost all their rights under this policy because they omitted to do an act which would have been confessedly nugatory—that is, to tender these moneys which, of necessity, must have been rejected by the defendants.

I do not know of anything analogous to such a pretension having a place among legal principles. The defendants cannot be permitted to impute a result occurring from their own incapacity, as a breach of agreement on the part of the plaintiffs.

The second exception taken at the argument of this action was, that this contract of insurance was a continuing contract, and was, on this account, *ipso facto* avoided by the occurrence of the war.

This contract clearly could not have been originated during the prevalence of hostilities. To insure the life or the property of an enemy while war was being waged, would be an illegal act. Such a contract involves an act of intercourse, and, in a state of war, as has been already remarked, all intercourse of a commercial or amicable nature is prohibited. But the contract in question was made while peace prevailed, and was, consequently, lawful in its inception, and as the payment of the premium was suspended, its continuance was not dependent on the doing of any act on the part of the company or of the assured. It has been repeatedly said that a continuing contract is dissolved by a condition of hostility, but I have not anywhere found that a contract which has been partly performed, and which still remains in force from its own intrinsic quality, without the doing of anything by any party to it, is thus destroyed. Nor can I conceive why

a continuing contract, in part executed, should be annulled from this cause, except on the ground that it calls for some kind of intercourse which is inconsistent with the duty of citizenship. The question has not, as yet, received any decision which is to be regarded as entirely authoritative. It is still open and is to be settled by a reference to general considerations and by the application of analogous principles.

Whether a state has a right, according to the established rules of modern national law, to confiscate the property of an enemy found in its own dominions, is a question about which the most eminent of the writers on public law are not agreed. Those among them who construe the rules of war with severity, maintain the existence of such a right, but the number and weight of authority are opposed to such view. But, in this country, the question is at rest, for there are several adjudications of the Supreme Court of the United States in favor of the more rigorous rule. But whilst this harsh doctrine has thus been established, it is attended with this qualification, that, to effect such confiscation, an act of congress is requisite. The result is, that an enemy's property found in this country on the breaking out of hostilities is, in the absence of all action of the national legislature, not liable to forfeiture. Debts due from a citizen to an enemy stand on the same ground—they can be seized by the legislative pleasure, but are not confiscated by mere belligerency. "We may therefore lay it down," says Chancellor Kent, "as a principle of public law, so far as the same is understood and declared by the highest judicial authorities in this country, that it rests in the discretion of the legislature of the Union, by a special law for that purpose, to confiscate debts contracted by our citizens, and due to the enemy ; but, as it is asserted by the same authority, this right is contrary to universal practice, and it may therefore well be considered as a naked and impolitic right, condemned by the enlightened conscience and judgment of modern times."

A just appreciation of this principle, and a proper application of it, seems to me to lead very plainly to a result adverse

to the position taken by the counsel of the defendants. If tangible property and debts are not confiscated by a condition of war for the benefit of the public, how can it be plausibly urged that a vested right, such as arises out of the present policy, is to be forfeited by the operation of the same cause, for the benefit of one of the contracting parties? To properly understand the exhorbitance of such a claim, we have but to consider the character of the right thus sought to be seized. An insurance company agrees to pay a stated sum of money on an event that is certain to happen. In consideration of this promise, annual payments are to be made, which, in the progress of time, often exceed the sum for which the life is insured. Each day, as it passes, adds to the value of the interest which the assured has in the policy. When the life insured is nearly spent, the value of such interest approaches its maximum, and there is not much less than the interest which a man has in a debt just falling due. To illustrate this, a life of thirty years' standing is insured for $50,000; premiums are annually paid, and, at the age of eighty or ninety, no one will doubt that the assured has an interest in the $50,000 which falls little short of a present ownership. And it is such an interest as this which, it is claimed, a state of war, *proprio vigore*, vests indefeasibly in the insurance company.

It is admitted that if the life had fallen in before the war, and the liability of the company had thus become fixed as a debt, the effect of the war would have been merely to suspend the payment of such debt. A discrimination between a vested interest of this kind which is maturing, and a debt growing due, is altogether too artificial and imaginary to be legal. The rights of the assured should not be thus sacrificed, nor should an insurance company be allowed to seize to itself this property, unless it can be shown that such consequence is inexorably demanded from motives of public policy. Reflection upon the subject has satisfied me that a continuance, during the progress of war, of an insurance on the life of an enemy, is not inconsistent with the welfare of either of the belligerents.

What effect can the existence of such a contract have upon the public interests of the one or of the other? If money for a past consideration fall due, after a declaration of hostilities, the debt is not cancelled, but the payment of it is suspended until peace is proclaimed. The reason why the debt is allowed to be preserved is, that the existence of such a debt does not work any injury to the government of the debtor; and the reason why the payment is suspended is, that the receipt of the money would be a direct contribution to the pecuniary resources for hostile uses of the government of the creditor. And so clearly has this principle been acted upon, that it has, on many occasions, been decided that the payment of a debt due to an enemy is allowable, if made to an agent of the creditor residing under the dominion of the government of the debtor; the money, in such case, not being drawn beyond the control of the latter government—for it would be clearly illegal for the agent receiving such payment to transmit the funds to his principal until the restoration of peace. It is incontestably plain, therefore, that the state of debtor and creditor, resulting from transactions anterior to the war, is not interdicted by the rules of national law; and as the continuance of the efficacy of a life-policy can have no greater effect than to produce a state of debtor and creditor, how can such continuance be pronounced illegitimate? It was urged on the argument that the policy, if held valid, might be enforced, even though the life insured was lost in the war; but such a deduction is unfounded, for the argument can, by no reasonable construction, be so extended. It has already been shown that the English courts have long since declared that there was an implied condition in every marine policy that the promised indemnification should not be extended to losses occasioned by a capture made by the government of the underwriter.

A stipulation that the money should be payable, even though the life insured should be lost in a war which might arise between the states of the assured and the insurer, would be clearly illegal and void; and the consequence is, no such provision, which, if present, would vitiate the whole agree-

ment, can be understood to be comprehended in the general expressions which are in common use in these policies. An exception is invariably implied, embracing every case of a loss of life by any means concerning which it would be criminal or incompatible with the law, or against the public interest, to stipulate or bargain. I cannot see that there is anything in either of the grounds thus taken, which should be permitted to defeat the action. The adjudications heretofore made on this subject, although the precise points in the present case does not appear to have been present in any of them, exhibit a decided tendency to reject the doctrine that a policy of life insurance is avoided by a state of war, or by the non-payment of premiums during its continuance. *The Manhattan Life and Fire Insurance Company* v. *Warwick*, 20 *Gratt.* 614; *Robinson* v. *International Life Assurance Company*, 42 *N. Y.* 54; *The New York Life Insurance Company* v. *Clopton*, 7 *Bush* 179.

With respect to the formal exception that this action has not been brought in the name of the party to whom the promise was made, I do not think it should prevail. The general rule is that the suit may be brought on these policies, when in the form of simple contracts, in the name of the party having the beneficial interest. It is true that the agent who effected the insurance is styled in it a trustee, but that does not make him such, as his powers and capacities appear to be those only of an agent. The declaration would have been more consistent with correct theory, if it had laid the promise according to the legal inference to have been made to the plaintiff, but this is a defect of form which is cured by our statute—at least when the exception is raised on demurrer. It was likewise urged that, by virtue of the incorporation of the defendant, the plaintiffs, as holders of a policy, became partners with the other corporators, and that the war dissolved such partnership. It does not seem to me that a state of war would, for reasons already given on another branch of the case, dissolve a partnership of this character; nor does it appear how such a dissolution, even if it took place, would

affect the obligation of the policy; but it is enough at present to say that the pleading demurred to does not disclose the existence of such a relationship, and that, consequently, the point is not now raised.

The plaintiffs are entitled to judgment.

AFFIRMED, 8 *Vr.* 444.

CITED *in Martin* v. *Franklin Fire Ins. Co.*, 9 *Vr.* 141; *Steelman* v. *Mattix*, 9 *Vr.* 249.