TAGGERT (BATTEN v.). See Case No. 1,-107.

TAINTER, The ALICE. See Cases Nos. 194–196.

TAINTOR (UNITED STATES v.). See Case No. 16,428.

---

# Case No. 13,726.

TAIT et al. v. NEW YORK LIFE INS. CO.

[1 Flip. 288; 19 Int. Rev. Rec. 14; 2 Ins. Law J. 863; 4 Bigelow, Ins. Cas. 479.] [1]

Circuit Court, W. D. Tennessee. Dec. 10, 1873.

INSURANCE—LIFE—POLICY—FORFEITURE—CONDITIONS PRECEDENT.

1. A policy of insurance, which indemnifies a public enemy against loss in time of war, is unlawful; and where entered into before hostilities, is abrogated when they occur. The rela-

[1] [Reported by William Searcy Flippin, Esq., and here reprinted by permission. 19 Int. Rev. Rec. 14, 2 Ins. Law J. 863, and 4 Bigelow, Ins. Cas. 479, contain only partial reports.]

tions it establishes are illegal between belligerents.

[Cited in Bird v. Pennsylvania Mut. Ins. Co., Case No. 1,430.]

2. Where a life policy provides that it shall be void upon the nonpayment of premiums within the time prescribed, such payment is a condition precedent; time is of the essence of the contract, and there can be no recovery if punctual payment is omitted.

[Cited in Anderson v. St. Louis Mut. Life Ins. Co., Case No. 362.]

3. Where the performance of a condition precedent becomes unlawful, or by the act of God, impossible, this will not authorize a recovery upon the contract without performance. Such case distinguished from those in which subsequent impossibility and illegality are relied upon as a defense.

4. A contract of insurance, the continuance of which depends upon the election and acts of the insured, is not like a debt, the obligation of which is absolute, and which is suspended only by war.

5. The relations between the members of a corporation for mutual insurance present all the evils, and are dissolved by war for the same reasons as those between ordinary copartners.

6. The reasons for the dissolution of executory contracts by war are not alone that such contracts involve intercommunion across the hostile lines, or that they relate to property liable to capture; but more especially because their execution increases the resources of the enemy.

7. A court of equity has no authority to decree the specific performance of an agreement in favor of a party who has failed to perform a condition which is of the essence of the contract, although prevented by its becoming subsequently illegal or impossible by act of God.

8. A court of equity will not relieve a party from the effect of omitting to perform an act, although the omission was caused by subsequent illegality or impossibility arising from the act of God, where such act was merely optional, and the other party had no right to enforce its performance.

9. The agency of one representing an insurance company, authorized to receive premiums and renew policies, becomes unlawful when the insured and insurer become public enemies.

The plaintiffs in this case [W. E. Tait and others] are the legal representatives of Dr. Samuel Bond, who died August 8th, 1862. The facts upon which the principal questions of law in this case rest, are as follows: Dr. Bond, in his lifetime, viz.: on October 17th, 1854, procured a policy of insurance upon his life for the sum of $5,000, from the defendants, the New York Life Insurance Company, then and now a corporation for mutual insurance, organized and doing business under the laws of the state of New York, and having its home office in the city of New York. Dr. Bond then was, and continued until his death, a resident of the state of Tennessee. The policy was issued in the usual manner from the home office of the company in New York, the application being made and the policy being transmitted through their then local agent I. B. Kirtland at Memphis, Tennessee. By the terms of the policy the insured was to pay an annual premium of $224.50 on the 17th day of October in each year during the continuance of the policy; and upon his compliance therewith the defendants were at his death to pay to his representatives the amount of the policy. Amongst other things the policy also provided, that in case the insured "shall not pay the said premiums on or before the several days hereinbefore mentioned for the payment thereof, then, and in every such case, the said company shall not be liable for the payment of the sum insured or any part thereof, and this policy shall cease and determine." The annual premiums were duly paid at maturity by the deceased to the local agent at Memphis, up to and including the year 1860; the last payment being made in October of that year. Kirtland continued to act as the agent of the company at that point until sometime in July or August, of the year 1861, when all intercourse between the people of the state of Tennessee and those of the loyal states was cut off by the breaking out of actual hostilities; whereupon he ceased to act further as such agent, and has never since acted in that capacity. On or before the 17th of October, 1861, a tender of the premium due in that year was made, on behalf of the insured, to the former agent, Kirtland; which tender was refused. Kirtland then had no receipts for the said premium, signed by the home officers of the company, in his possession. The officers of the company had no knowledge of the tender until after the death of Dr. Bond, nor did they ever communicate with Kirtland in reference to the same. The powers and duties of the agent sufficiently appear in the opinion of the court. This suit was brought in October, 1869, to recover the amount of the insurance, less the unpaid premiums.

Humes & Poston, for plaintiffs.

Randolph, Hammond & Jordan, for defendant.

EMMONS, Circuit Judge. This is an action upon a policy of life insurance. The policy was issued some years before the war, and the premiums paid to 1861, when the agency at Memphis ceased in consequence of the war. A tender was afterwards made in due time to the former agent, of all sums due before the death, which was in that year. The contract contains the following clause: "It is the true intent and meaning hereof that if the insured shall not pay the said premiums on or before the said days, together," etc., this policy "shall cease and determine." Across the face of the first and all other receipts taken by the assured for the premiums paid, is printed conspicuously, in large type of italics and capitals and in red ink, the following: "Premiums not paid when due according to the terms of the policy, annuls the same, but it may be renewed at the home office within a reasonable time, upon satisfactory evidence of good health being furnished." The acts by which alone the policy can be continued in life, involve not only the exercise of continuous active duties on the part of agents,

but constant intercommunion across the hostile lines. Every receipt, in unambiguous terms, tells the insured no payment is good unless the party who claims the right to accept it holds an authenticated form, signed by the president, vice-president or actuary, which necessarily must be transmitted from the home office to the local agent from time to time as it is required. There is no general power to receive premiums without this special warrant, issued in each instance. The object of this precaution is manifest: it is so necessary to the prosecution of the scheme, and is so dependent upon regular communications between the agent and the chief officers, that when the latter are interrupted it necessarily follows that the payments, without an alteration of the contract, cannot be made. A life insurance agent who should not make his periodical returns and remittances would be an anomaly. Should a corporation fraudulently or negligently omit to forward the annual receipt in violation of duty under the policy, or by its wrong in any manner prevent performance on the part of the insured, different principles would apply, and a recovery at law or in equity according to circumstances be given.

The only argument submitted by the learned counsel for the plaintiffs consists in the citation of the following four cases: Manhattan Life Ins. Co. v. Warwick, 20 Grat. 614; Hamilton v. Mutual Life Ins. Co. [Case No. 5,986]; Sands v. New York Life Ins. Co., 59 Barb. 556; and New York Life Ins. Co. v. Clopton, 7 Bush, 179, and a dictum in Robinson v. International Life Assur. Soc., 42 N. Y. 54, which expresses a doubt as to the entire clearness of the position that war abrogated the agency. Since the rendition of our judgment, but before the preparation of this opinion, two other decisions, by an influential tribunal, have been added to the list of those which oppose our own. Cohen v. New York Mut. Life Ins. Co., 50 N. Y. 610, and Sands v. New York Life Ins. Co., Id. 626. These decisions, if acquiesced in, would, each for quite varying reasons, entitle the plaintiff to judgment. But for them we should have deemed the question whether an insurance company, created and protected by the government, located in and drawing its funds from the loyal region, could continue a policy upon life for the benefit of an enemy as unworthy of argument. We should have confidently held that a state of belligerency dissolved the contract.

That these judgments are at war with the universally received opinion before their pronunciation, we think clear. Another case, however, upon a kindred subject (Kershaw v. Kelsey, 100 Mass. 561), by a court of exceptional learning and repute, quite as much at variance with received opinions, shows there is a pretty common disposition to refuse the application of old and familiar doctrines to the exigencies of our late contest. But we find in our supreme court no indication of a disposition to relax that portion of the laws of war which affects the contracts and business relations of belligerents. Believing there is no judicial authority anywhere, to so far modify the law as to preserve in force this contract, we hold it was abrogated the moment the insured and insurer became public enemies.

The counter-judgments vary greatly in the grounds on which they proceed. Without referring each reason to the decision which asserts it, the leading ones are generally as follows: They are here stated that the occasion for much of our own discussion, which might otherwise seem unnecessary, may be perceived. It is said that contracts and business relations between enemies are lawful so long as actual personal intercourse, between persons in the different territories, is not necessary; and consequently, a business already commenced under an agent, may be continued if he makes no remittances or communications to his principal. The continuance of a life policy and the agency is thus supported. Some of them, overlooking the palpable difference between the duties of an insurance agent and of one to receive a debt, and between the latter and this peculiar contract, requiring for its continued vitality so much affirmative action, continue both upon the same principle. It is said that all the cases and elementary books heretofore announcing the broad doctrine that an insurance of enemy's property is void, and that war abrogates those entered into before it, refer solely to insurances upon maritime commerce, where the subject was not only liable to capture, but employed in unlawful trade and intercourse between the hostile countries, and the insurance void therefore, and not upon the ground that it was opposed to public policy to guaranty against the loss of enemy's property generally, but only where it was so employed, and where it was, by the general laws of war, subject to confiscation. That houses, inland-stored goods, and the lives of non-combatants did not come within the reason of the rule, and might be lawfully insured through resident agents, and belligerency did not in such cases terminate existing policies. Some of them take the broad ground that the punctual payment of the premium is not a condition precedent. Others, conceding that it is so, decide that payment is excused on account of the illegality or the impossibility of performance. Two of them maintain the extraordinary position that the revocation of an agent's power after he becomes a public enemy is a fraud by the loyal company, and estops it to deny the reception of the premiums. And finally, it is ruled that a court of equity will relieve the insured from the duty of performance, upon the ground that the accidents of the war constitute an excuse for nonperformance. These do not exhaust the grounds, but they are the more prominent ones.

The principle that contracts, the continued execution of which during belligerency is op-

posed to national policy, are abrogated by war, is universally conceded. With the single exception of Kershaw v. Kelsey, all admit also, that such policy would be violated by the making or continued execution of any contract which directly increased the material prosperity and power of the enemy. Differences of opinion only exist in reference to the application of this rule to policies of insurance upon the life of a public enemy. Authors and cases which discuss the general rule will be referred to, therefore, only for the reasons by which they support it, and the circumstances to which they have applied it. We think it will appear that the policy before us is abrogated by the rule; and that the distinctions relied upon · are wholly excluded by the reasons upon which it rests. There are two main propositions upon which the controversy turns: 1st—Is the continued execution of a life policy inconsistent with political interest? 2d—Is the payment of the premium during war a condition precedent to recovery? These two questions are all that are material to this decision.

The general rule is, that all contracts and intercourse of every description are prohibited during war; and that those agreements, the execution of which increases the power of the enemy, are wholly annulled, and the parties reciprocally discharged from their performance. This generality would include the contract before us. But exceptions have been created to its application, and within these it is contended this case comes.

Relying upon Denniston v. Imbrie [Case No. 3,802] and Ward v. Smith, 7 Wall. [74 U. S.] 447, it is said that debts are suspended, not discharged; and that this is but a debt. The distinction between the two is obvious. Where the consideration has been received and the obligation to pay is complete, no new act or volition, and no continuing business activity is. necessary. By suspending all these the debt, without national injury, remains. Under a policy of insurance, when carried out according to the very intention of the parties, and in the only mode compatible with the financial scheme upon which it depends, the most continuous and intimate business relations and intercourse are indispensable. No local agent ever is, or in common prudence can be, trusted for years to receive payments without remittance. Such is their number and widespread localities, that it has been found absolutely necessary to evidence their authority of receiving payment by periodical transmission of authenticated vouchers. These are never sent unless the home office has received full reports of the agent's doings and a satisfactory accounting for all the premiums before then payable. When a premium is tendered in due time, if any violation of the terms of the policy by the insured has become known to the agent, it is his duty to decline receiving the premium, report the circumstances

to the home office and await instructions. And when a death occurs the important duty devolves upon the agent of receiving and transmitting to the home office the proofs required to show that the terms of the policy have been complied with by the deceased, and that his death did not result from any of the numerous causes excepted from guaranty by the policy. And although the agent has nominally no authority to allow or disallow a claim, he is, in fact, always relied upon to detect and report any suspicious circumstances which may exist in reference to the death or the character of the proofs, so that, to a very great extent, it rests with him to determine whether the claim shall in any case be contested. It is simply monstrous to suppose that the loyal members of this great scheme are compelled by law to confide this delicate function to a public enemy, who is to exercise it in favor of his fellows in rebellion. The rule would be as unjust as its exercise would be illegal. These forms and duties are well understood by the parties, and constitute a part of the contract between them, and are intended to be specifically and exactly performed. They cannot be so performed without much intercommunion across the lines. To dispense with them is to change the whole nature of the scheme, and involves an unprecedented and wholly unwarrantable interference with the substantial terms of the agreement.

We have no great motive for combating the doctrine which some of these cases hold, that it is from enlightened Christian principle that in modern times debts are not confiscated. We shall, however, better appreciate the rule we are considering, and shall apprehend its true spirit, if we understand that from its inception it has always been aimed solely at the destruction of the enemy and the protection of the home government. When debts are held to be suspended only, it is as purely a political and mercenary policy as that which forbids the continued performance of an executory contract. It is in the interest of home commerce after peace. It is the same motive which leads a nation, when the subjects of a hostile government own portions of its funded debt, to suspend the debt, and even pay the interest upon it till the return of peace. A nation draws but little upon the New Testament when its statesmen omit a policy which would destroy its credit with all the nations of the earth. It could not borrow a dollar from the subjects of neutral countries after it had confiscated the property of its temporary enemies in its public funds. Commerce would be impossible, if upon each occurrence of war, private debts were confiscated. A more suicidal policy could hardly be pursued. These are limitations upon every nation's power of injury, which have sprung, not from the pulpit, but from the workshop and the counting-house. While nations still recognize as lawful inci-

·dents of war the bombardment of cities, and the reducing of its women and children to distress, and the taking of human life, it seems almost whimsical and grotesque to attribute the protection of bills and bonds to Christian principle. They are, nevertheless, in fact spared; and whatever may be the motive, the question equally remains, whether the limitation which exempts them is applicable to the exigencies of this record. Do the latter present a case analogous to a complete existing debt? Or do they constitute an executory contract, the continued performance of which, during war, has so frequently been declared unlawful? Like injuries, in some degree, undeniably exist in instances where the law spares the relation, as in those where it annuls it; and some of the benefits secured in exigencies where the rule has been applied, would undoubtedly be secured in others by extending it. We cannot now, nor has it ever been attempted, establish a principle, the reason of which will, in every instance, guide us in decision. But a line has, in fact, been drawn, including some and excluding others, as political policy, balancing benefits and evils, has deemed one or the other to predominate. What we affirm, and shall attempt to show, is, that what is historically established brings the contract before us within the rule which abrogates the contract. A leading, if not the most important motive, for the prohibition is, to prevent the increase of the material power of the enemy. This is equally accomplished by the creation of a new debt, which constitutes a credit upon which the enemy can procure supplies, as by the creation of the products themselves. That this benefit to the enemy is the leading idea, and not solely the prevention of intercourse, is proved from the frequency with which every nation at war from time to time licenses trade with the enemy in such articles as its necessities demand. See Wheaton on International Law. The assumption on the part of the government is, that all trade not so authorized is for the benefit of the enemy. At least it invariably reserves the power, in all cases, of determining whether the trade will be of more benefit to itself than to the hostile government. This balancing of benefits is the test. While the whole power of the nation is exerted to cut off their supplies, and reduce to want and suffering the entire hostile nation, it would be absurd to suffer its efforts to be counteracted by allowing its subjects to perform agreements which would produce or increase what it is endeavoring to destroy; and this we understand to be the essence of the rule.

It is wholly immaterial, so far as this consequence is concerned, that the agreement is made, or the business relation created, before hostilities. A Northern citizen, engaged before the war in carrying on a Southern plantation, or the manufacture of iron, cloth, or leather, through local agents, with ample power to bind him by executory contracts, could not lawfully continue these avocations during hostilities. In reference to all these he would become a public enemy. It is paradoxical to say that a loyal citizen's relations to a business are lawful, the products of which become enemy's property. This is distinctly said by Kent, Story, and Sir Wm. Scott, as we elsewhere show. If such agent had entered into contracts for the reception and manufacture of materials highly useful to the rebel government, it is but an absurdity to say that, because he was appointed before the war, and no intercommunion was necessary, he was either compelled or authorized to carry out the contract, or that the loyal citizen should be subjected to damages because he did not.

A marked difference in the relations existing between enemies under this policy of insurance, and those of ordinary debtors and creditors is, that in the latter the obligation is full before the war. No new value or source of credit is placed in the hands of an enemy during its progress. Here, no obligation whatever exists, but a debt is created by much mutual activity and elections between the parties. A source of credit, and a power of purchase with its proceeds, is thus originated. A value is created which would have had no existence in the hostile country but for the action of one of the very enemies whose government has the power of seizing it. In the instance of a debt paid over to a local agent, no increased obligation, or value of any kind, is subordinated to the hostile state. The debt is equally in its power, whether in the hands of a debtor or paid over to the agent. The debtor only is changed, both residing in enemy's territory. They are so wholly unlike in their circumstances and in practical, financial results, that the same rule should not be applied to each.

The accident in this case—that the rebel government did, in fact, confiscate all debts due from loyal citizens—would render the payment of these premiums unlawful, even if it be conceded that, had a different policy been pursued, it would have been otherwise. When the act of an enemy creates a value which, eo instanti, passes to the enemy's treasury, that it does so is an additional reason why it is unlawful to continue the agreement under which it took place.

Among other reasons for not abrogating this contract, conspicuously urged in this series of judgments, is that the sum insured will not be paid till after the return of peace. It will not, therefore, it is said, furnish material aid to the enemy. This position is a concession that if it does so, it ought, upon principle, to abrogate the contract. But a thousand policies due against solvent companies are among the most certain sources of future payment which could be placed in the hands of our enemies. This

is self-evident, and cannot be rendered plainer by illustration. It would seem singular that a financial fallacy so transparent, as that these obligations are not present aids, should have been resorted to at all. But it is still more singular that it should be reproduced, after having been overruled again and again in the series of judgments which hold that marine policies are annulled by hostilities. In three of the English judgments, hereafter cited, this argument was made at the bar, and was answered by the court, that the obligation was present capital in the hands of the enemy. And it was upon this reason, more than any mere intercourse which was promoted by the insurance, or anything in the nature of the subject matter insured, that the judgments were rested. The leading idea in all these instances is, benefit to the public enemy.

Subject matter of insurance, or cause of loss, is of comparatively little consequence. In the single instance of insuring one subject to be called into the army, there would, indeed, be the additional impolicy of making him more ready to go there. But in a case where the policy forbids military service, such conditions need not be considered. In all other instances, the financial result, the injury to the home government, and the additional power and source of credit given to the enemy, is precisely the same. Whether the insurance be upon ships, upon mills and manufactories in the enemy's territory, or upon the life of a non-combatant; and whether the property and life are destroyed by fire, tempest, or the casualties of war, through raids or sieges; the same sums, in precisely the same legal conditions, pass from the hands of loyal citizens to public enemies. It is impossible to discern, practically or legally, the slightest difference. Let us suppose a fire insurance for a series of years, in the form now used, with premiums payable annually, upon property located in Richmond or Charleston; five of them are destroyed by accidental fire, and five are ignited by the shells of the army. Shall part be paid, and the residue not? A recurrence again to the judgments in reference to maritime insurance will show, that this whole subject is fully discussed and actually decided; and that it is not dictum, as it has been so repeatedly said to be. The point was made, that the policy was not necessarily void in all instances as the subject of insurance might not be captured by the government, but might be destroyed by the accidents of navigation; and that, although it might be impolitic to suffer the enemy to be reimbursed for an injury produced directly by the war, the reason did not apply where it happened from those casualties insured against in time of peace. The reply was, that it was unlawful for a loyal subject to continue to stand guaranty for any loss or damage whatever of a public enemy during war; and that the policies

were annulled, no matter what might be the cause of loss.

We esteem it but a perversion of the real reason of this class of judgments, to assert that it reposes solely upon the fact that the insurance was maritime. That instances of other contracts and insurances did not occur in judgment, Sir William Scott, in The Hoop [1 C. Rob. Adm. 196], took pains to say, resulted solely from England's insular position; and that the same principle applicable to marine insurances would affect those of property upon land. Is there any distinction which a court of justice has a right to make in this regard, between property which is engaged in maritime commerce and therefore a little more commonly destroyed, and that which is located in cities subject to siege, or in the territory of the enemy which, by the usages of war for all times as policy demanded it, is laid waste by armies? In the raids of both parties during our late war, mills and manufactories of all kinds, tanneries, tobacco and cotton, corn and every material which could support a people or an army, were destroyed; and the health of non-combatants thus impaired and their lives endangered. And we say here, as we have just said in reference to another point, that what was lawful in a certain war might be unlawful in another, depending upon the political policy of the government which waged it. Where both governments resorted to confiscation, and each laid waste the territory of the other, it is a mere distinction in words, without any practical difference in actual condition, to say that a maritime policy is annulled and one upon inland property or upon the life of a non-combatant continued.

References to the leading authors and judgments upon this subject will not be made for the purpose of verifying those generalities which are mutually conceded; but, by a reproduction of their argument, to show that the reasons upon which they rest the rule, and the exigencies to which they have applied it, include those now in judgment. This can not be successfully done without considerable detail, necessarily involving much prolixity. In view of the great prominence which has in modern criticisms been given to the fact that the earlier judgments referred to contracts involving international intercourse, some pains will be taken to show, as we go over the cases, that this is by no means a material feature. This argument derives importance, less from its real nature than from the accident that it seems to be conceded that if all agreements, irrespective of intercourse, are unlawful between belligerents, then these life policies should not be continued by payment of premiums during the war. It is true they have been likened to mere debts; but the chief reliance is upon the other position.

The most full consideration of the general subject of the illegality of contracts between

belligerents to be found in any one adjudication, is the opinion of Chancellor Kent, in Griswold v. Waddington, 16 Johns. 438. Its doctrine that all agreements made during war, and the continued execution of those which are executory made before, are unlawful, which had been repeatedly announced in anterior federal judgments, is reproduced in his Commentaries (volume 1, pt. 1. § 3), and cited with approbation by every prominent English and American writer upon international law since its delivery. We think we may successfully challenge the citation of a single criticism upon its accuracy, by either author or judge, until the recent decisions in reference to life insurance. It has been accepted as American common law from the day of its delivery down to the recently attempted revolution. Even upon the supposition that some portions of the elaborate treatise contained in his judgment were dicta, its conclusions have so influenced professional and judicial opinion as to constitute it a high authority, irrespective of the facts which produced the judgment. See 2 Brod. & B. 598, per Lord Eldon, and 15 East, 225, per Lord Ellenborough. We cannot better subserve the purposes of our argument than to analyze quite fully Griswold v. Waddington, and reproduce, with considerable fullness, its arguments and citations. It was a suit to recover the balance of an account accruing during war, for bills remitted from this country to England. Two of the firm resided in New York, and the other in the latter country. The whole demand was for items received by the foreign house. It was decided: first, that war ipso facto dissolved the co-partnership, because the relation was incompatible with political duty, and therefore, receipts of money by the English members subsequently, did not obligate those in this country; second, that funds transmitted there could not be recovered, because the transmission itself was unlawful. This was the first judgment which declared directly the effect of war upon a co-partnership between enemies entered into before hostilities existed. Among the numerous grounds urged to distinguish this case from those to which the principles announced by the court had been theretofore applied, was, that the partnership did not necessarily extend to commercial intercourse between enemies, but might, by presumption, be confined to the domestic business and neutral trade of England; and that contracts and business relations were not prohibited so long as actual intercourse between the hostile countries was not involved, and did not in fact result. In answering this argument it became necessary to determine whether it was an essential element that the agreement or commercial relation should involve actual locomotion across hostile lines; or whether the continued execution of the agreement, although entered into before the war, was not unlaw-

ful, even though it pertain solely to the domestic trade of Great Britain. We more particularly call attention to these features of this judgment, on account of the recent decision in Kershaw v. Kelsey, where many of its doctrines, and those of similar import declared by the circuit and supreme courts of the United States, are denied, and said to be chiefly dicta. We do not so read the judgment; but consider it pointedly, deciding that all contracts voluntarily made with an enemy during war are void for illegality; and that all such as involve the continuance of any active business relation, or of continuing responsibility for the acts or losses of an enemy, are dissolved by war. The reason why such effect was produced upon the partnership was the fact that all contracts between enemies being unlawful, they could no more be made through the agency of resident copartners than personally. That absence of necessity for personal intercourse was immaterial. The principle is directly applicable to the abrogation of an agency for the making, renewal or continued execution of contracts; and to all sharing of or guarantying against loss—all of which are involved in the partnership relation. Chancellor Kent, at page 451, cites Grotius, lib. 3, c. 22, as saying: "Private contracts with the enemy, touching private actions and things, are unlawful." Gronovius, one of Grotius' commentators, he says, repeats and illustrates the principle. Puffendorf, lib. 8, c. 7, § 14, is said by his illustrations clearly to exclude all contracts, save those made by prisoners and residents in the enemy's country for necessaries and self-protection; and that Barbeyrac, in a note to the passage, declares that private agreements between enemies are forbidden by law. Vat. Law. Nat. bk. 3, c. 16, § 264, confines the right of making private contracts in the same way. This is declared to be all the "indulgence" allowed to private contracts during "war;" and it is further said that no private negotiation by way of business is tolerated. Page 453, Heineccius, is referred to as saying "that it cannot be permitted that one should enter into negotiations with those with whom we are at war. Le Guidon (French treatise) c. 2, § 5, is quoted as saying that no subject of the king can put his hand to an insurance of property belonging to an enemy. It does not say property in transit to or from an enemy's country. It is then shown that the French rule is in conformity with the ordinances of Barcelona of 1484. Cleirac, p. 197, is then referred to as repeating the rule in reference to insurance, and as adding that enemies cannot negotiate with each other. Valin and Emerigon are declared to be full to the same purpose. At page 455, he sums up what thus far had been shown; and among other results he supposes that "private negotiation or contract whatever is admissible, save in case of self-defense." The earlier history of the English common law, and the judicial

announcements in that country of the maritime law, are then minutely traced. The judgments reviewed are in reference to trade between the belligerent countries; but the reasons and declarations of opinion quoted, amply sustain his deduction that contracts are per se void between enemies. The leading federal cases are fully considered in the judgment. At page 483, he says: "There is no authority in law, national, maritime or municipal, for any kind of private, voluntary, unlicensed communication, business or intercourse with an enemy. It is all noxious, and in greater or less degree criminal. Every attempt at drawing distinctions has failed. All intercourse but that which is hostile, or created by the exegencies of the war, is illegal." Thus far, it is true, he was dealing with the proposition that the contract was void because predicated upon an illegal trading between the countries; but he was also preparing the elements for the support of his second and equally necessary proposition, that the contract was dissolved because no contract could be executed which involved continuing performance, and no business relations could exist, whether intercourse was involved or not. At page 488 it is said, war dissolves a copartnership for the reason that "an enemy" (partner) "cannot in that capacity make a contract binding upon the other (partner). This would seem to be the inevitable result of the new relations created by the war." Such a reason is literally applicable to the abrogation of the agent's power in this case; and also terminates the liberty of election by the insured to continue a guaranty in his favor, the moment he becomes a public enemy.

Furtado v. Rogers, 3 Bos. & P. 191; Potts v. Bell, 8 Term. R. 548; Kellner v. Le Mesurier, 4 East, 396; Gamba v. Le Mesurier, Id. 409; Brandon v. Curling, Id. 410; The Hoop, 1 C. Rob. Adm. 196; Esposito v. Bowden, 7 El. & Bl. 763; Avery v. Bowden, 6 El. & Bl. 953,—and the other English cases growing out of the Russian war, are all, as has been said in the judgments which refuse to follow the substantial principle they lay down, cases where the property insured was subject to maritime capture, and where the contracts sued upon involved intercourse with the enemy. From this fact it is argued that their principle abrogates such insurance only, and that those upon inland property and business are not affected. But Chancellor Kent, and all the other elementary writers, and the federal courts, deduce from them the broader doctrine which we announce, and which we have already endeavored to consider upon principle. The unusual length of our judgment compels us to omit our analysis of these cases. It is conceded that their language, their argument and illustrations, literally sustain a rule which would compel judgment against the plaintiff here. It is argued only that the facts in the several judgments did not call for the announcement of so broad a doctrine. If the rule of interpretation is to be applied, which deduces the extent of a doctrine from its reason, and the motives which call for its institution, and which applies it in all circumstances where the very evils are to be prevented against which it was intended to guard, then this list of judgments has not been misinterpreted for half a century, and the novel contrary reading is unjustifiable. And should we accept that other rule of interpretation, which confines the operation of a declared principle to the precise facts, and limits its extent to the actual necessities of the case, calling for its announcement; and should it be conceded that, tested by this rule, the announcements in question are dicta, still we should, in view of their history, consider them entitled to great weight from their having been so long recognized as law. But there is no necessity of resorting to any reverence for oft-repeated dicta here. In no sense is the generality obiter, which declares it unlawful to continue insurance upon the property of an enemy. In Furtado v. Rogers, there was no international communion, because the voyage insured was from one French port to another; and the judgment necessarily rests solely upon the impolicy of insuring enemy's property. But even in the cases where international intercourse was involved, and where the property was subject to confiscation, three objections. distinct, it is true, but all equally arising upon the records, were presented: 1st—That the commerce was international, and unlawful intercommunion would result. 2d—That the property was subject to capture, and so it was unlawful to insure it. And 3d—Which is more particularly applicable here, that the contract was one of continuing performance, where a loyal subject stood continuously bound to guaranty a public enemy against loss. The last was just as appropriately discussed and decided as the first. With precisely the same propriety it may be argued that all which is said about intercourse and confiscation is mere dicta, because unnecessary in a case which might have been disposed of on the ground of continuing performance and guaranty against loss. It is not true, in fact, that all these judgments are rested upon the features of national intercourse, or upon the fact that the property is subject to confiscation. The other objection, that it was unlawful to stand responsible for the losses of a public enemy, however they might happen, was distinctly asserted. The cases, therefore, which so emphatically lay down the doctrine we apply, and which have so long stood for law, must be overruled, or judgment in this case must be given against the plaintiff. In Ex parte Boussmaker, 13 Ves. 71, Lord Chancellor Erskine, in deciding that an alien enemy might prove his debt in bankruptcy, and in reply to an argument at the bar, said: "If

the contract had been made with an enemy during war it could not stand a moment—it would be void. The circumstances involved no intercourse between the hostile countries. A contract between enemies is declared to be illegal." In Brown v. U. S., 8 Cranch [12 U. S.] 110, timber was seized by the government as being maritime property of an enemy, and condemned at the circuit. But, as it had been unladen from the ship, it was deemed by the supreme court upon land; and upon this point the decree was reversed. Justice Story had condemned the property at the circuit, and it there became necessary to pronounce upon the legality of the purchase by the claimant, who, after the commencement of the war, had bought the timber from an agent of the enemy in this country. There was no communication whatever with England in order to consummate this contract. In reference to this sale, he said: "Brown claims by virtue of a contract between enemies during the war. It is of no importance what the character of the agent is. No principle is better settled than that all contracts with an enemy, made during war, are utterly void." This utterance, necessary for the case in the circuit, was not touched by the judgment in the supreme court. It is a decision by a judge, who, if we may except Chancellor Kent, had more thoroughly studied this department of the law than any other American jurist. He decides that a purely domestic contract with an alien enemy, through a loyal citizen agent who had received all his powers and instructions before the war, is void, because it creates an obligation which is capital and present increase of the enemy's available means. This was not a dictum. The learned judge could not have rendered his decree without so ruling. And we repeat, that the reversal of this decree upon other grounds, by a court which has itself so repeatedly announced the same rule, in no way shakes this precedent as an authority for a tribunal circumstanced like this one. The point decided in The Julia, 8 Cranch [12 U. S.] 181, was, that sailing under an English license, even to a neutral port, was unlawful. But in the opinion in the circuit, which was approved and appears as that of the court above, in answer to the argument that the purchase of the license in a home port was lawful, because goods might be bought of enemy's manufacture in a neutral port, it is said that such a purchase from an enemy would be illegal. That it is "unlawful in any manner to lend assistance to the enemy by attaching ourselves to his policy, facilitating his supplies, or separating ourselves from the character of our country." The idea that intercourse is necessary to invalidate, is excluded. In The Rapid, 8 Cranch [12 U. S.] 155, it became necessary to assert the principle upon which the unlawfulness of intercourse with the enemy rested, as there was no purchase or contract, but simply the removal of property owned before the war by the claimant. The court lay down the rule so often asserted by it since, that: "Every individual of one nation must acknowledge every individual of the other as his enemy, because the enemy of his country." "They who compose the belligerent states exist, as to each other, in a state of utter occlusion." It is unnecessary to quote authorities; they are numerous, explicit, respectable, and have been ably commented upon in argument. In this case [Case No. 11,576] the circuit judge, Story, said: "It is difficult to sustain the opinion that trade can subsist in a state of utter hostility, or that contracts and credits can be valid when they are subject to confiscation."

The federal judgments since have in no way limited these principles. Scholefield v. Eichelberger, 7 Pet. [32 U. S.] 586, was a suit for goods bought by the plaintiff from the defendants in England during the war, but not received until peace. The correspondence containing the orders went over in a cartel ship, and was inspected by government officers. The idea of unlawful intelligence was excluded. The court say "the doctrine at this day is not to be doubted, that during hostilities the citizens of the hostile states are incapable of contracting with each other." In suggesting possible limitations to the rule, even in instances where the contracting party is already lawfully within the hostile territory, and where there is no intercourse between the countries, the court mention those for necessaries and for money to return home. All others are said to be illegal. They are far from including leases of real estate, its actual cultivation and the production within the enemy's country of its chief and most valuable staple, such as Kershaw v. Kelsey declared to be lawful. As little do they include the continuance of a guaranty to an enemy creditor against the loss of his demand if his debtor die, such as 20 Grat. sustains. In The William Bagley, 5 Wall. [72 U. S.] 377, the court, with some severity, applied the old doctrine, that the share of a subject or neutral in property of a firm doing business in the enemy's country, was subject to capture; and this, too, where the business was commenced before the war, and the loyal claimant had left the South for a residence in New York. There was no intercommunion; but the produce of business in an enemy's country is, pro hac vice, enemy's property. All the adjudications and elementary writers which lay down and illustrate this familiar rule, show that it rests upon the fact that such business and all manufactures and productions of the enemy's soil, increase his strength and prolong his power of resistance. Between the practical consequences of those acts and relations which these rules declare to be illegal, and those which are begotten by this scheme of mutual insurance, there is not one scintilla of difference. In Coppell v. Hall, 7 Wall.

[74 U. S.] 542, there was a fraudulent use of an English consul's "protection;" and the military permit to cross the lines was held to be unauthorized; but in declaring the purchase of cotton illegal, from a belligerent, by one domiciled at New Orleans, then in Federal possession, the court repeat, in their utmost extension, the principles upon which we rely. Justice Swayne cites and approbates what we elsewhere quote from Wheaton and Kent, and The Hoop, 1 C. Rob. Adm. 196, and at page 556 says: "The objection rests upon the same principle as insuring enemy's property," and refers to Emerigon, Bynkershoeck, Valin, and Phillmore, and various common law authorities, to show that this is everywhere held to be illegal. Illegal not only because it aids maritime commerce, but because, as he forcibly illustrates, it adds to the resources of the enemy. After quoting at length from Chancellor Kent, in Griswold v. Waddington, he cites and approbates what Story, Justice, says in Brown v. U. S., as follows: "No principle of law is better settled, than that all contracts made with an enemy during war are utterly void." And see U. S. v. Lane, 8 Wall. [75 U. S.] 185; McKee v. U. S., Id. 163. This latter case, although not necessarily depending upon such a ground alone, we think is made to rest upon the illegality of a purchase by one lawfully within the Rebel lines, and where there had been no removal of the cotton out of the territory where bought. In U. S. v. Grossmayer, 9 Wall. [76 U. S.] 72, a debtor, being within the Rebel lines, at the request of a creditor in New York, bought cotton and deposited it in payment of a debt, with an agent selected during the war. It was not transferred North, nor intended to be. No money was sent South, and no new consideration paid; but simply an old debt was discharged. It was held that no title vested in the creditor, because the negotiation for the agency was in violation of public duty. In this case we grant that the only element of illegality consisted in the negotiation for the agency. In the act of payment from an enemy to a loyal citizen, through a local agent, without intercommunion of any kind, there is no public injury, actual or presumed. But whenever new arrangements are to be made, elections to be manifested and notified, or any new relations assumed to create which a new meeting of minds is necessary, or an additional act performed, the transaction would be illegal within the judgment in the Grossmayer Case. 1 Duer, Ins. 415, says, it will subsequently discuss the "important question whether the contract is not illegal and void in some cases where the property insured is not liable to confiscation." After stating the reason why marine insurances are illegal to be that "the whole body of insurers become in their hearts the enemies of their own government;" and "that they are under a constant temptation to save themselves from

ruin;" on page 418 he adds, it is an ancient doctrine of the common law "that all contracts made with an enemy during war, with a few necessary exceptions, not including insurance, are illegal and void." Justice Story, in The Emulous [Case No. 4,479], is referred to. In the note the only exceptions are stated to be bills by prisoners of war and similar contracts. At page 473, note 2, the English cases are considered and the rule deduced, that an insurance upon enemy's property becomes void by war, whether the loss is by capture or otherwise; and that war occurring subsequently to the policy, abrogates it. He concludes the note by saying that contracts are suspended, only when they give an absolute vested right, irrespective of any further act or volition of the parties, such as notes and bonds; but that an executory agreement, when any additional performance is necessary in order to keep alive the obligation or perfect the right, so far as future performance is concerned, is discharged. His whole treatment of the subject clearly includes a case of life insurance terminating the agency and abrogating the policy. See page 463, note 2. Page 582, says that the reason for the familiar rule that property, suffered to go into an enemy's port on its way to a neutral or home port, is subject to subsequent capture, is "because the property became liable to seizure by the enemy when in its port; and the subject violated his duty to his own government by subjecting it to that hazard." This reason is literally applicable to the creation of credits subject to confiscation by the rebel power. Story, Partn. § 315, says, public enemies "can make no valid contracts with each other and hold no communication of an amicable nature." And see Story, Ag. §§ 461, 462, 481, 482, 599. Bunyon on Life Insurance (19 Law Lib. 28, or 63 Law Lib. N. S. 308), says: "The life of an alien enemy cannot, however, be insured by his creditor, although the latter be a British subject." We might not push the principle upon which we rely quite so far as this learned author. We should be inclined to uphold an insurance by a loyal person, upon the life of an enemy debtor, in a home company. No additional interest in saving the life of the enemy debtor would be created by such a policy; its only effect would be to transfer that interest from the creditor to the insurer. 1 Phil. Ins. p. 126, §§ 223, 224. Arnold, Parsons, and every other elementary writer, by their analyses of judgments and their modes of announcement, assume as settled law, that all contracts, save for necessaries and ransoms, are illegal between enemies; and that all the cases of marine insurance are but instances of the application of this principle. That there is anything in their nature distinguishing them from transactions on land, or contracts made within a hostile country, the effects of which are to increase the resources of the hostile government, is no-

where hinted at. This idea is found solely in the few modern judgments which have upheld contracts for raising cotton in the enemy's country and the continuance of life policies.

That a contract, the performance of which becomes illegal by matter subsequent is discharged, and that this familiar rule is applicable to policies of insurance, see Woods v. Wilder, 43 N. Y. 167; Furtado v. Rogers, 3 Bos. & P. 191; Brewster v. Kitchell, 1 Salk. 198; Leathers v. Commercial Ins. Co., 2 Bush, 298; 2 Pars. Cont. 674; Presbyterian Church v. New York, 5 Cow. 538; Bennett v. Woolfolk, 15 Ga. 213; 1 Pars. Adm. & Shipp. 329; Gray v. Sims [Case No. 5,729]; Odlin v. Insurance Co. of Pennsylvania [Id. 10,433]; Hanger v. Abbott, 6 Wall. [73 U. S.] 532; Esposito v. Bowden, 90 E. C. L. 762, 7 El. & Bl. 763, and the English cases there cited.

Modern authority is not wanting for the judgment we render. Several well-reasoned judgments and opinions of learned judges sustain our views. In Sands v. New York Life Ins. Co., in a painstaking opinion, and after full review of the English and American judgments and elementary writers, showing that no source of opinion was overlooked, Judge Robinson, as referee, holds that a life policy was abrogated by the war; that the continuance of the agency was unlawful, and the payment of the premium a condition precedent, the non-performance of which defeated an action. He shows what a reading of the case would readily suggest, that all which Justice Platt says, in Buchanan v. Curry, 19 Johns. 137, in reference to the completion of executory contracts, and which has been so frequently quoted, is wholly obiter.

In Cohen v. New York Mut. Life Ins. Co., the superior court of New York make a similar ruling, and deny relief in equity. This is the same cause decided differently by the court of appeals. Bliss on Life Insurance, at page 644, cites the decision of the superior court of Baltimore, in Mitchell v. Mutual Life Ins. Co. of New York [unreported], deciding that the policy was abrogated by the war. In this latter case the question is asked, if it could be contended for a moment that the policy would be good upon the life of an Englishman if it provided expressly for its continuance in case of war with his country. Such a policy, it is assumed, would be void. In the superior court of Baltimore, Stephens v. New York Life Ins. Co. [unreported], Judge Dobbin holds that the policy is annulled by hostilities, and says: "Where the contract is executory in its character, and is such as renders commercial intercourse between the respective belligerents necessary in order to perform its conditions," and "where the contract is such as to operate as an indemnity to the party insured against loss of damage occasioned by the other belligerent, there the contract is not merely suspended, but dissolved." Although books are not cited, the learned judge takes pains to say that the question had

been several times most thoroughly argued before him, and that he had maturely considered it.

Among the leading and forceful judicial arguments in favor of abrogating these policies, is the dissenting opinion of Judge Christian, in Manhattan Life Ins. Co. v. Warwick, 20 Grat. 614, in which a policy upon the life of a Rebel debtor, taken by a Rebel creditor to secure his debt, was held not to be abrogated by three judges against two. Dillard v. Manhattan Life Ins. Co., 44 Ga. 119, is a decision precisely in point upon a life policy. In a well-reasoned opinion, going over most of the applicable authorities, judgment was given against the plaintiff.

With this long line of adjudications establishing the doctrine that such a continuing contract, and such relations as this mutual scheme creates, are abrogated by war, and after the correctness of such doctrine has been asserted by every elementary writer who has spoken upon the subject, and so often announced by the court of last resort which is to review our judgment, we have no doubt about our duty in rendering judgment against the plaintiff. We should have none, even though we perceived more reason and justice in the adjudications which oppose our own. But after the most painstaking examination of them, and after having given the cause far more consideration than our time permits to most cases, we are with much respect constrained to say, that neither their conclusions nor the grounds upon which they rest commend themselves to our judgment. Irrespective, therefore, of the points hereafter considered, we should deny a recovery in this case, upon the sole ground that the contract became unlawful, and was discharged the moment the parties became public enemies.

We have not had access to the discussions of this subject in the court of claims, but, judging from references to its decisions, we should infer that its opinions accord with our own. See Blakeley's Case, 2 Nott & Hunt. 323; Gearing's Case, 3 Nott & Hunt. 165; Stoddart's Case, 4 Nott & Hunt. 511; Dillon's Case, 5 Nott & Hunt. 587; Grossmayer's Case, 7 Nott & Hunt. 129; Padelford's Case, Id. 144.

It is a distinct ground of defense in this case, that the payment of the premium on the day is a condition precedent, and that, irrespective of the illegality of continuing the indemnity after hostilities, the policy became void by the nonperformance of this condition. Reference will be made to the cases which announce the old and unquestioned rule—that a condition precedent must be performed, in order to furnish grounds for recovery under the contract—only to show that the circumstances relied upon to take this case out of it, attend its most ordinary administration. Impossibility of performance, growing out of unanticipated exigencies, constitutes no exception to its operation. Bliss (Life Ins. pp. 253–274) fairly states the leading American and

English cases, stringently applying the doctrine that payment is a condition precedent. He cites Robert v. North Eastern Mut. Life Ins. Co., 1 Disn. 355; Bergson v. Builders' Ins. Co., 38 Cal. 541; Norton v. Phoenix Mut. Life Ins. Co., 36 Conn. 503; Phœnix Life Assur. Co. v. Sheridan, 8 H. L. Cas. 745. This last case, and 1 Disn. 355 (s. c., 2 Disn. 106), refer to the fact that it is optional with the insured whether he will continue the policy, as an additional and conclusive reason why it must be terminated by his failure to pay on the day. In Simpson v. Accidental Death Ins. Co., 2 C. B. (N. S.) 257, Creswell, J., interrupting counsel, says: "If the insured really means to drop the insurance, but meets with an accident within the twenty days, he may, according to your argument, tender the premiums which he never intended to pay, and make the company liable." Such an interrogatory is still more applicable to the condition of things here. For those who have died, representatives claim compensation; while hundreds of those who survive refuse to continue because they can do better by a new insurance. This company would, beyond all doubt, be quite willing to pay for all who are dead, if all those who survive would pay up back premiums, thus carrying out the scheme according to its intention and financial theory, and affording a fund to pay the losses. In Catoir v. American Life Insurance & Trust Co., 4 Vroom [33 N. J. Law] 487, the court approbate the provision avoiding the policy for nonpayment, and the rules of law applicable to it, as eminently just and necessary for the safety of the company and of the public which relies upon its solvency and punctuality. In Want v. Blunt, 12 East, 183, the insured died within the fifteen days allowed for making the payment. It was a case of great hardship, and was elaborately argued. The form of the policy was substantially like that before the court. Upon full consideration of the doctrine in reference to conditions, it was held that, substantially, the insurance was from quarter to quarter, where the premiums were so paid; that so far as the insured was concerned, it was a new contract each time he elected to pay and continue the insurance. Lord Ellenborough said it was one of insurance, and must be read in view of what the parties undoubtedly intended by the words they had used. This intention, deduced from increased fullness in the stipulations and long practice under them, is still more undoubted now. The subtle and irrational distinction suggested in a note to Cohen v. New York Mut. Life Ins. Co., 50 N. Y. 610, between the latter case and another in the forty-fourth volume of the same series, was strongly urged upon the court in Want v. Blunt, but was disregarded. In Gamble v. Accident Assur. Co., Ir. R. 4 Com. Law, 204, and Howell v. Knickerbocker Life Ins. Co., 3 Rob. (N. Y.) 232; Id., 44 N. Y. 276, sudden death in one case and paralysis in the other prevented performance on the day, but the rule was applied. Upon this ground Dillard v. Manhattan Life Ins. Co., 44 Ga. 119, is a case in point for the defendants. Premiums there were not paid on account of the war. It was said that where the contract made no exceptions, the court could not treat the occurring of the war of the Rebellion as such. The judgment is well reasoned and amply verified by citations. We see no reason why this familiar principle does not entitle the defendants to judgment, although the war alone prevented payment in time. Some additional reasons relied upon to take this case out of the operation of this rule are elsewhere considered in connection with the judgments where they occur.

Some of the judgments relied on by the plaintiffs decide that, if the war rendered the payment of the premiums impossible, such fact constitutes an excuse; and that a subsequent tender authorizes a recovery. There are but a few cases where subsequent impossibility is an excuse, even where it is relied upon only as a defense. And there is a broad difference, both at law and in equity, between protecting a defendant from an action for damages, and authorizing him to recover against another, where, in like circumstances, he has failed to perform a condition precedent on which his right of action depended. And still wider is the distinction where the condition is optional, the agreement, so far as this feature is concerned, unilateral, and the damages dependent upon some act to be performed at the election of the plaintiff. Before Manhattan Life Ins. Co. v. Warwick, 20 Grat. 614, and Hamilton v. Mutual Life Ins. Co. [Case No. 5,986], we know of no judgment or elementary book which suggested there could be recovery in such case. 2 Pars. Cont. 672, says, no degree of mere hardship will satisfy the rule that the act of God rendering performance impossible is a defense. And in no case is impossibility an excuse, if it refer solely to the personal disability of the promisor, there being no natural impossibility in the thing. See Id. 459. The cases which establish and apply this rule show most clearly, that far greater effort is demanded from the promisor, than that of requiring the insured to leave the rebel region and come within the loyal lines, if he wishes to continue the indemnity; and quite as clearly that it is no answer to say that, in the accidents of his personal circumstances, he was unable to do so. The following American judgments are fully sustained by the English cases they cite and approve. Thompkins v. Dudly, 25 N. Y. 272, was an action to recover back money paid towards the construction of a schoolhouse, which the defendants had covenanted should be built by a day named, but which, just before its completion, was destroyed by fire. The court say, that a contract positively to do an act is not discharged by inevitable accident; and the greatest hardship will not prevent the application of the rule.

School Dist. No. 1 v. Dauchy, 25 Conn. 530, in which the building was destroyed by lightning, is approved. In this latter case, Elsworth, J., says: "In the contract no provision was made for any contingency, and defendant can incorporate none into it, but must abide by his absolute undertaking." This case quite fully cites the leading English and American judgments. In School Trustees of City of Trenton v. Bennett, 3 Dutch. [27 N. J. Law] 514, where, under a similar undertaking, the building fell down, owing to a latent defect in the soil, installments paid were recovered back upon the like ground. It is said "that he who by contract creates a duty upon himself, must perform it, notwithstanding any accident by inevitable necessity; because he might have provided against it in the agreement." The New Jersey court add, that "however apparently harsh the rule may be occasionally, it has its foundation in good sense and inflexible honesty." And see Adams v. Nichols, 19 Pick. 275. In Dermot v. Jones, 2 Wall. [69 U. S.] 1; Bullock v. Dommitt, 6 Term R. 650; Brecknock & A. Canal Navigation v. Pritchard, Id. 750; School Trustees of City of Trenton v. Bennett, 3 Dutch. [27 N. J. Law] 513; Beebe v. Johnson, 19 Wend. 500; Beale v. Thompson, 3 Bos. & P. 420; all extreme applications of the rule, are cited and approved; and the following remarks made by Justice Swayne: "The principle which controlled these cases rests upon a solid foundation of reason and justice. It regards the sanctity of contracts. It requires parties to do what they have agreed to do. If unexpected impediments lie in the way and a loss must ensue, it leaves the loss where the contract places it. If the parties have made no provision for dispensation, the rule of law can give none." He says that in such cases equity will not interfere. The fact that in this case recovery was had upon the common counts when the defendant had received and occupied the house, in no way qualifies the principles we have quoted from the judgment. And see Chit. Cont. 734; 8 Term R. 259; Ang. Carr. 294; 3 Burrows, 1637; [Sturges v. Crowninshield] 4 Wheat. [17 U. S.] 204; Co. Litt. 206b.; Shep. Touch. 164; Harmony v. Bingham, 12 N. Y. 99; Oakley v. Morton, 11 N. Y. 25. The case before us is one at law, and even if, in an extreme case, equity would relieve, there can be no pretense that in this action an excuse can be accepted by the court in place of performance. The contract in this case, in the most unambiguous terms, declares the premiums must be paid on the day or the policy is void. There is no exception of difficulties or impossibilities. The agreement is absolute in terms; and the nature of the scheme and the presumed intentions of the parties leave no room for the slightest doubt that they mutually intended its literal enforcement. It bears no possible analogy to the cases of forfeiture and penalties intended to secure acts and payments, where time is not of the essence of the contract; which, in our estimation, are so inapplicably quoted in several of the judgments from which we dissent.

Before the recent decisions cited by the plaintiffs we find no case or author suggesting that a complainant in a court of equity is entitled to relief where he has failed to comply with conditions precedent, which he was under no obligation to perform, and the contract was, in that regard, wholly unilateral. Much less have we been able to discover a single instance of interference where the agreement is in common use, and punctuality is well understood to be of its essence. The distinction between enforcing a right dependent upon conditions, and protection from penalties intended to secure collateral payment, we do not know to have been disregarded in any other judgments. The learning upon this subject is as familiar as any in the law, and will be considered only to insist upon its misapplication in the opposing judgments. There are many exceptions to the rule that equity will relieve even from penalties and forfeitures; and the grounds upon which they rest are applicable for greater reasons to exclude interference here. Story's Equity Jurisprudence contains a full and accurate discussion of most of the older judgments upon the subject. After stating generally, in sections 1302 to 1307, that at law he who enters into a contract which by any possibility can be performed by any one, although impossible for the party himself, is bound by his agreement; and after citing the conflict of authority as to whether the party is discharged at law where by act of God performance subsequently becomes impossible, he announces a rule in equity which in no case interferes with the intention of the parties. It is said in section 1316, a penalty is relieved from only when intended to secure a payment; and all the cases cited demonstrate that it is where there is an absolute obligation to pay money, and the penalty was to enforce it. The idea of relief is completely excluded where, as in this case, an affirmative right is claimed, and no obligation existed to perform the conditions upon which alone the contract accorded such right. That the intention always governs, is further discussed in section 1318, in reference to liquidated damages. An application of this principle, peculiarly germane to the facts in this record, is illustrated in section 1325, where it is said that considerations of public policy, and of what is necessary to carry out corporate objects, frequently render punctual payment necessary. In such cases, it is said, relief is never granted from forfeitures of subscriptions and stock. A perusal of the judgments which sustain this rule, amply justifies its policy, and suggests what is true, that no class of corporations or general process of business more eminently calls for the ad-

ministration of this doctrine than those now before the court. And see sections 287, 288, and the discussions generally of the doctrine of conditions, by this learned author. In Robert v. New England Life Ins. Co., 1 Disn. 355, an action was brought asking relief from what was erroneously called a forfeiture for non-payment of premiums on the day, and a decree asked for the sum insured. In one of the ablest judgments to be found on this subject, by a judge who has few superiors in the American judiciary, Gholson, J., for the court, refused the relief. He says, if the contract for absolute punctuality violates no principle, the parties may insert what terms they please, and the law demands a strict compliance. Easton v. Pennsylvania & O. Canal Co., 13 Ohio, 79; Egan v. Mutual Ins. Co. of Albany, 5 Denio, 326; Beadle v. Chenango Co. Mut. Ins. Co., 3 Hill, 161; Jennings v. Chenango Co. Mut. Ins. Co., 2 Denio, 75, are cited, in all which the literal terms of the agreements—such being the presumed intention of the parties as deduced from the nature of the contract—were rigidly enforced. That there can in such a case be no relief in equity, because the real intention was to indemnify only while the premiums were paid, and relief would, therefore, involve the creation of a new agreement by the court, is forcibly shown. It is said that from the very nature of the contract, the punctual payment is of its substance. He cites and approbates the fully applicable case of Davis v. Thomas, 1 Russ. & M. 506, affirmed on appeal, where a purchase was lost by neglect to pay rent on the day, and relief refused, because it was optional, and one party only bound. The agreements in these insurance cases were said to be alike unilateral, the company having no power to force its continuance; and this feature alone was conclusive against relief. The true nature of the agreement, which we think is wholly overlooked in the recent judgments, is stated, and attention called to the fact, that for a few hundred dollars the company was called on to pay $8,000. This would be just if demanded in the conditions upon which alone it was agreed to be paid. But we submit that it would be alike unjust and demoralizing to the law to decree its payment by making in effect a new agreement for the parties. The risk which is run by the company is a full, meritorious and solid consideration for the premiums already received. Some of these judgments speak as if, financially, this element of consideration was not known to the law; or if so, only as a technicality without substantial value. None stand higher, or receive fuller protection, both at law and in equity. The latter courts are full of illustrations of withholding relief where parties have had the benefit of chances. In Wells v. Smith, 2 Edw. Ch. 78, a contract to convey provided that it should be void unless the complainant made certain payments, and

mortgages, and other details, by a day named. It was held, upon the distinction between the authority of a court to grant relief from a forfeiture, and that to vest an estate originally where a condition was unperformed, that no relief could be given. These cases are fully cited and reviewed. The decree is affirmed in 7 Paige, 22. Pike v. Butler, 4 Comst. [4 N. Y.] 360, dismissed a bill asking relief from the consequences of failure to erect a building in precise conformity with a contract, where the loss was total without it. Gardiner, J., says: "It is the enforcement of a legal right operating oppressively in the particular case, but against which it is difficult for law or equity to afford relief without substituting the undefined, and therefore dangerous, discretion of a court for the fixed principles upon which the law in relation to contracts, should be administered." And see, also, Crippen v. Heermance, 9 Paige, 211; Benedict v. Lynch, 1 Johns. Ch. 370; 1 Sim. & S. 598, note 2; Wiswall v. McGowan, 1 Hoff. Ch. 139; Gates v. Green, 4 Paige, 355; Holtzapffel v. Baker, 18 Ves. 116.

Time is always deemed of the essence of the contract, where its subject varies in value, or the motives and interest of complainant are subject to change. Doloret v. Rothschild, 1 Sim. & S. 590; Stubbs v. Lister, 1 Young & C. Ch. 94. The cases on this subject are numerous and varied. The health of the insured, his changed circumstances after a few years' delay in non-payment, oftener than otherwise produce an abandonment. This contingency is several times noticed in the judicial discussion of these policies, and most materially affects its interpretation, and the standing in a court of equity of those who seek a recovery where premiums have not been paid. It is but common justice that it should do so. See, in reference to this subject generally, the following cases: Mutual Ben. Life Ins. Co. v. Ruse, 1 Bigelow, Cas. 83; Howell v. Knickerbocker Life Ins. Co., 3 Rob. (N. Y.) 232; Robert v. New England Mut. Life Ins. Co., 1 Bigelow, Cas. 634; Catoir v. American Life Ins. & Trust Co., supra; O'Reily v. Mutual Life Ins. Co. of New York (Super. Ct. Nov. 22, 1866) [2 Abb. Prac. (N. S.) 167]; Koelges v. Guardian Life Ins. Co., 2 Lans. 480.

If this contract were an isolated transaction between individuals, a court of equity would refuse to enforce it against the obligor as unconscientious. See Story, Eq. Jur. § 331 et seq.; Fry, Spec. Perf. § 203 et seq. The judgments on this subject abundantly demonstrate that equity would afford no relief in the enforcement of such an agreement, where the complainant for a few hundred dollars asked as many thousands. The contract becomes just and moral only when it becomes a part of a great system, and rests upon the averages of many thousands of lives. The only rational mode of con-

templating the transaction is to consider all those who live in the loyal states as an aggregate, insuring all those in the disloyal, and to administer such a rule as would do justice generally between the two classes. Cohen v. New York Mut. Life Ins. Co., 50 N. Y. 610; Hamilton v. Mutual Life Ins. Co. [Case No. 5,986], and their associate judgments, decide that the body of members who punctually pay shall remain liable to such portion of those who do not pay, as happen to die within the period of suspended payments, while they have not a farthing of claim on that great mass of other delinquents who outlive this period, and refuse to pay their premiums after the war. The financial consequence is identical with that which would result from a deliberate selection and insurance by the officers of the company of a given number of lives which they knew would terminate within five years, and a rejection of a still larger number which it was known would pay premiums for an indefinitely longer period. As is said by the learned Justice Hunt, in his dissenting opinion in Howell v. Knickerbocker Life Ins. Co., 44 N. Y. 286, in arguing an analogous question, the usage would amount to "a practice of receiving small premiums for the issuing of large policies of insurance upon the lives of persons already dead. To bring it to the case of Mr. Howell, who, according to this construction, was only one of a numerous class, the case was this: This company agree with Mr. Howell that if he should die on the 15th of July of any year, after twelve o'clock at noon on that day, or within a few days thereafter, if any one on his behalf should then pay to the company the sum of $138, they would at once issue or renew a policy upon his life for one year for the sum of $5,000. They would, in short, agree positively to pay $5,000 for the consideration of $138. * * * It is, as already stated, an agreement to insure the life of a man who is dead at the time of making the agreement." The entire scheme depends upon the assumption of what is known to be true, that a small number only would die within a short period, while the far greater portion will live and pay premiums to a comparatively advanced age. These modern judgments cut the scheme in two, and say to all those who are public enemies: "None of you need pay your premiums as provided in the contract; but those who happen to die are entitled to the full sum insured, deducting the premiums, while not one of your fellow enemies are compelled to contribute a dollar for this purpose. The money shall be paid by loyal citizens alone." The disastrous effects of such a rule of law upon a mutual insurance company, and the vital importance to them of the prompt payment of premiums by all for whom they stand guaranty, will appear by a simple illustration. It is well known that the whole scheme of life insurance is based upon the law of average. Out of a given number of insured persons, statistics show there will be on the average a certain proportionate number of deaths each year; and in a mutual scheme, the premiums to be paid each year by the whole number insured are fixed at such an amount as will make their sum total just sufficient to meet the losses arising from the average deaths during the year, and to provide for unforeseen fluctuations of the law of average and other contingencies, including necessary expenses. Thus, in a company consisting of one thousand persons, insured for one year for $1,000 each, where the average number of deaths was fixed at ten, each member must pay a premium of $10, making in all $10,000 of premiums, in order to meet the ten death claims—supposing, for the sake of simplicity, that there are no expenses or fluctuations of average. The company would thus meet its liabilities, and be solvent at the end of the year. Now, suppose it start the next year with the same number insured in like manner, and on the same basis, but that five hundred of those who paid premiums in the former year suspend payment in this. Out of the five hundred who pay the average number of deaths will be five, and the amount of premiums paid will be just sufficient to meet those losses—$5,000. But five, also, of those who suspend will die, and under the rule in question the company would be liable to their representatives for $5,000 of death claims, less $53.50 of unpaid premiums and interest, with no means for meeting such a liability, and no claim whatever upon the survivors of those who suspend. If time were thus held not to be of the essence of these unilateral life insurance contracts, it is difficult to see how a mutual company can escape ultimate if not speedy bankruptcy. No one knowing such to be the law would pay a single premium after the first, but would suspend; and if he chanced to die within the time when the amount assured to him would exceed that of his unpaid premiums, his representatives would demand that excess; otherwise he would drop the policy, thus securing to himself all the benefit of his chances of death, while the company have no benefit of his chances of life after the first year. There is but little significance in a name; but our own idea of the result of such a rule of law is expressed by calling it rank injustice rather than the beneficent and kindly interference of a court of equity to prevent wrong. We have no doubt that were this a bill in equity seeking relief from the consequences of the impediments created by the war, as possibly it may be claimed to be, no relief could be given. For a greater reason must judgment be denied in this action at law.

So many of the arguments upon which the following counter-judgments rest have been already considered, that few of their points

will be here noticed, and those by no means the most important. Kershaw v. Kelsey, 100 Mass. 561, adds the considerable influence of the tribunal which decided it to the recent tendencies; but we do not perceive that its argument adds anything to the reasons which sustain them. We know of no more forceful illustration of the impolicy of the rule asserted in that judgment, than the simple statement of the unpatriotic and mercenary conduct it legalized. Indeed, we think we discover in the unparalleled meanness of the defense, that which greatly prejudiced the mind of the court in reference to its legality. A resident of Massachusetts, while his fellow-citizens were hurrying to the battle-field, betakes his capital, his son and himself to the enemy's territory, and renting a portion of it, enters into a contract for raising and preparing for market an article of produce so essential to the power which was endeavoring to overthrow the government, that it was declared subject to seizure by our armies. If every contract, the execution of which adds to the enemy's power of resistance, is void, this one certainly was so.

If it be true that the law presumes the citizen to intend what he ultimately does in its violation, then the circumstances before the Massachusetts court presented a case where that court was bound to presume that the unlawful transportation of the cotton to Massachusetts was one of the original objects of the contract, and to have held the contract void for that reason.

Upon the face of the report, a case was clearly made where the presumption was that the defendant crossed the lines for the purposes of the agreement. Intercommunion was therefore established, and within the reasoning of the case itself, the contract of leasing was unlawful.

A citizen never so loyal, in any way interested in the produce of an enemy's soil, becomes in reference to such products, an enemy. In 1 Kent, Comm. 74–76, it is said: "It was considered by Sir Wm. Scott (The Phœnix, 5 C. Rob. Adm. 21, and in The Vrow Anna Catharina, Id. 161) that the possession of the soil impressed upon the owner the character of the country, so far as the produce of the soil was concerned, wherever the residence of the owner might be. The produce of a hostile soil bears a hostile character for the purpose of capture, when in the process of transportation from an enemy's country." "The enemy's lands are the great source of his wealth and the most solid foundation of his power; and whoever possesses land in the enemy's country, though he may in fact reside elsewhere and be in fact a friend, must be taken to have incorporated himself with the nation, and the produce of the soil is enemy's property." "The reasonableness of this doctrine will be acceded to by all nations, and is particularly recognized by the supreme court of the United States."

See 1 Duer, Ins. 451, and Thirty Hogsheads of Sugar, 9 Cranch [13 U. S.] 191, where Chief Justice Marshall uses nearly the same language. The manifold applications of this doctrine, found in Wheaton, Phillimore, Halleck and every European continental writer, show that Kershaw v. Kelsey, in holding legal a lease of land in hostile territory which must result in the production of material aid to an enemy, is clearly at war with it. We have endeavored to show that the only exceptions to the rule that contracts with an enemy are void, are those for ransoms and necessaries. But this judgment sweeps away the rule entirely, and legalizes, not only the continuance, but the creation of every possible agreement for the production of material and the manufacture of supplies in the enemy's territory, where intercommunion across the lines is not involved.

Cohen v. New York Mut. Life Ins. Co., 50 N. Y. 610, carefully states the correct general principle, and concedes that this contract would be void, if at war with public policy. In arguing that it was not so, the court take the three following positions: 1st—That the insurance of the life of an enemy involves no interests hostile to those of our government; 2d—That it comes within the principles of the decisions which suspend only the right of action upon bonds and notes; and 3d—It approbates the argument in Kershaw v. Kelsey, that intercourse across the hostile lines is necessary to render a contract void. These positions we elsewhere consider in our general argument. The objection that the payment of the premium was a condition precedent, was answered by what was to us a somewhat novel application of the doctrine announced in Brewster v. Kitchin, 1 Ld. Raym. 317; Touteng v. Hubbard, 3 Bos. & P. 291; Wood v. Edwards, 19 Johns. 205; People v. Bartlett, 3 Hill, 570; Wolfe v. Howes, 20 N. Y. 197,—and other similar judgments, where it is held that performance is excused on the part of a defendant when from a change in the law it becomes illegal or, from the act of God, impossible. We have already considered this subject, and recur to it here simply to say, that after a careful examination of the cases cited, we consider all of them, in their arguments and illustrations, as pointedly against the application of the rule made in the judgment. At page 623 it is said that interest compensates for non-payment of the premiums; and Hamilton v. Mutual Life Ins. Co. [supra], and 7 Bush, 179, make a similar assumption. If a single transaction only is looked at, and we omit to consider the fact that the payment of premiums is not obligatory, and ignore the nature of the mutual scheme which is such that financial injustice of the grossest kind results from compelling the company to pay for those enemy delinquents who die, while few of those who survive pay their premiums at all—then beyond doubt interest, if compounded, would seem to compensate mathematic-

ally for payment. But a moment's consideration will serve to show that it does not in fact compensate. These cases overlook the palpable difference to the company between assuming a risk and assuming a loss. The insurers are entitled to, and do have this interest (i. e., the use of the money,) where the contract is exactly carried out; and in a case where the insured is still living, and is in as good health as when the first unpaid premium fell due, we think interest would compensate on a renewal of the policy, because the risk is then the same as would have been taken had the premium been promptly paid. But where the health of the assured has failed or death has occurred, the insurers are called upon to accept a greater risk or an absolute loss, upon the same terms on which they agreed to accept the risk contemplated by the policy. The ruling of these cases compels the insurers to assume a loss for precisely the same consideration which the policy awarded them for assuming a risk. But such a consideration is wholly foreign to the necessities of this argument. A policy of life insurance is a part of an indivisible scheme, incapable of existence as an isolated transaction; and all arguments which consider it otherwise are but misconceptions of its true nature.

It was urged upon the New York court that this scheme created a copartnership, and that upon conceded principles the relations between the members were therefore dissolved by war. This was answered from the bench by pointing out the familiar difference between a copartnership and a corporation, whose existence is not at all affected by the withdrawal of a portion of its members. We think such a reply involves a misconception of what must have been the objection of the very learned counsel in that cause. They could hardly have made the mistake of supposing, that the judicial personage created by the laws of and doing business in the state of New York was dissolved because a portion of its members, by virtue of the very terms and conditions provided by the contract itself, or otherwise, had ceased to be such. Manifestly, what was intended to be urged was, that the precise evils resulting from continuing commercial partnerships, follow the continuance of this scheme of mutual insurance—meaning what is to us entirely obvious, that a large body of persons in the loyal region would be interested in the health and prosperity of an equally large number of our enemies, and directly affected pecuniarily far beyond the mass of their fellow-citizens, by the bombardment of every rebellious city, and by every raid into their territory, which would deprive of shelter, raiment or food, other members of the corporation; and that therefore, the principle which dissolves a partnership forbids also this relation. This objection was not successfully answered by saying, what no intelligent lawyer would question, that a corporation in these circumstances was not dissolved like a copartnership. The difference between the relations of members in this mutual scheme, and of those in ordinary stock corporations the object of which is to prosecute a business unconnected with its shareholders, is most obvious. Here, each member is personally and directly interested in the health and welfare of every other; thus presenting, in the most efficient form, the precise evils upon which the principle dissolving copartnership rests. In an ordinary corporation, whether there be ten or ten thousand corporators, and whether they be comfortable or uncomfortable, it is wholly indifferent.

Semmes v. Hartford Ins. Co., 13 Wall. [80 U. S.] 158, is relied upon as deciding that the performance of a condition precedent is excused by the war. We think it has no tendencies to sustain such a proposition. The parties had agreed upon a period within which prosecution should be commenced, after every act had been performed and the obligation of the defendant rendered absolute. It was but a conventional statute of limitations. The judgment refers to, and rests upon, the same reasons as the decisions which hold, that belligerency suspends the running of the statute.

In Sands v. New York Life Ins. Co., 50 N. Y. 626, Judge Peckham, for the court, adds to the list of reasons why the policy is not abrogated, one which will somewhat startle the insurance lawyers of the country. He likens the clause for punctual payment to a covenant to pay a quarter's rent on a common lease. That we have the highest respect for that tribunal it is unnecessary to say. But when such an argument is necessarily resorted to to sustain a judgment, it is to us the very highest evidence that those reasons upon which alone we have a right to rely are wanting.

New York Life Ins. Co. v. Clopton, 7 Bush, 179, confines the rule we are considering to policies upon property which, according to the modern usages of war, is ordinarily confiscated when it comes within the power of the enemy. It would continue an insurance upon any branch of industry, without the payment of premiums. It does not take pains to say what would be the judgment, if the subject should be destroyed by raids from the Northern army. In speaking of a non-combatant, this and other cases seem to overlook the fact that they are as necessary to successful war as soldiers. Although learned writers differ as to the percentage which can be spared for the field, common reason shows it has very definite limits. Five hundred non-combatants, as they are termed, might have been selected from the rebel region, whose removal at the outset would have prevented the war; or would have terminated it within twenty days, if effected at any period during its continuance. The Reverend Mr. Clopton of the 7th of Bush, although he did nothing

but pray for Jefferson Davis and his government, was, beyond all controversy, of more consequence as a public enemy than any one obscure private soldier from his rebellious state. The distinction in this regard is without reason. It is not overlooked that, within our own reasoning, we are now considering what is wholly immaterial. We assert it to be so. We express our dissent from the attempted distinction, not because it is of any force against our conclusions, but for the reason that it is so frequently relied upon in counter-judgments. The subject of the insurance is never a criterion. That affects only the degree of impolicy and unlawfulness. The essential inquiry is, is it taken for the benefit of an enemy? No matter whether the subject be a ship, goods upon the ocean, manufactories of the great staples of life, in land or scientific manuscripts—in neither case has the insurance any tendency to increase the sum total of the enemy's property. But the evil consists in placing in the enemy's hands, through the obligations of the policy, that which will indemnify him after loss, thus increasing his resources. That this consideration, and not the subject matter of the insurance or the cause of loss, is the criterion, has been quite fully considered already in our general reasoning, and its illustrations need not be reproduced here.

It may invite a closer scrutiny of this judgment, to call attention to its suggestion that the agent might take a bond for payment of the premium at the end of the war, by way of avoiding the confiscation power of the rebel government. This would require some new headings in insurance books, and cause learned actuaries to study some principles with which they are not familiar.

The case of Hamilton v. Mutual Life Ins. Co. goes upon reasons which would authorize a recovery in a court of law; and, according to the rule familiar in the federal courts, the bill should have been dismissed. The decree of Judge Blatchford, as well as that in Cohen v. New York Mut. Life Ins. Co., 50 N. Y. 610, must have gone upon the ground that the legal right was imperfect, and are precedents in this action at law for the judgment we render.

The most extraordinary feature of the opinion in Hamilton v. Mutual Life Ins. Co., and one affording a remarkable illustration of the liberties which learned judges will take with fixed rules of law when they stand in the way of what they deem the merits of a just cause, is that part which attempts to answer the forcible objection, that the continuance of an agency to receive premiums became unlawful for the reason that, the instant he received them they were, by operation of the local law, confiscated by the rebel government. With much spirit of expression he declares this is no objection at all, because the agent could refuse the tender, and thus prevent the creation of a debt which the rebel government could seize. The opinion concedes that all agencies, the duties of which cannot be performed without a violation of political duty, are abrogated. When pressed with the fact that the duties of this one came pointedly within the principle, and asked to apply it in justification of its discontinuance, he replies: We will continue the agency, but avoid its illegality by a suspension of its functions. This is no distortion of the position, but almost its literal reproduction. The mind which was forced to resort to such an answer must have been close to the line which separates its judgment from our own. And this, too, is said in an opinion which holds the removal of the agency a fraud which estops the corporation to deny its continuance.

A somewhat singular application is made of Ruse v. Mutual Ben. Life Ins. Co., 26 Barb. 556; Id., 23 N. Y. 516, 24 N. Y. 653; Buckbee v. United States Ins., Annuity & Trust Co., 18 Barb. 541,—and kindred cases, which decide that, where the company, by its own fraud, prevents the payments, it is estopped to deny that they were made. It likens the refusal of a loyal citizen to continue a public enemy as his agent, the performance of whose functions is not only to create without consideration an obligation upon himself, but to call into existence successive debts which pass by the mere act of their creation into the rebel treasury, to those frauds and devices which enlightened judges have declared should not enure to the benefit of the guilty parties. We hardly think comment can be necessary to show the inapplicability of this class of judgments.

Wolfe v. Howes, 20 N. Y. 197; Jones v. Judd, 4 Coms. [4 N. Y.] 411; People v. Tubbs, 37 N. Y. 586,—from the list of judgments which, in modern times, have so justly established the right of a plaintiff to recover upon a quantum meruit, where the whole contract has not been completed, but there has been a partial performance beneficial to the defendant, are cited, in our estimation most erroneously, as grounds for the decree. This doctrine in its proper application, is well settled in the federal courts. The decisions cited are among the most enlightened of their class, and plainly distinguish between the right they protect and that of authorizing a recovery where a condition precedent has not been performed. In Dermott v. Jones [2 Wall. (69 U. S.) 1], Judge Swayne in the same judgment discusses and applies both principles. The short answer to what we deem a misapplication of these decisions is, that in this contract, punctual payment is of its essence; and if this is so, such decisions are wholly inapplicable.

Manhattan Life Ins. Co. v. Warwick, 20 Grat. 614. This case, decided by three judges against two, furnishes slight author-

ity for the plaintiff. It is needless to say that, in our estimation, the reasoning of Judge Christian and his dissenting associate, is the better law. An enemy creditor insured the life of an enemy debtor, in a loyal company; and a distinction between such a contract and one directly upon commerce and property, is still more subtle and fanciful than if the policy were upon the husband or father for the benefit of the widow and children. Still, the reasons upon which the last is protected, just as conclusively sustain a public enemy's insurance of one of his commercial securities.

In opposition to the most familiar judicial history, it is said that no judgment has ever held a partially performed contract abrogated; that the principle is never applied where it will injure the parties; and that the defense is actually immoral. This is quoted and approved in [Hamilton v. Mutual Life Ins. Co., supra]. Every case of marine insurance and all in reference to commercial intercourse involved partially performed contracts, the annulling of which entailed loss upon the parties. No branch of the rule has the slightest reference to personal protection, but in all instances of its assertion has universally subordinated private interests to the policy and presumed good of the nation.

The consequences of the abrogation involve quite different considerations. An executory contract, under which money has been paid, annulled by war, might, in particular circumstances, authorize, after peace, a recovery upon the common counts, as in the case of a rescinded contract. This question is not before us, and is referred to only as an answer to some of the extravagant illustrations employed in the opposing argument.

We are unable to appreciate the argumentative effect which the opinion imputes to the facts that a local statute demanded an agency, and that the policy constituted a Virginia contract; although these features seem to constitute leading reasons for giving judgment for the plaintiff. If the continuance of the contract is against public policy, it is wholly immaterial where it was made. If the functions of the agent could not be lawfully exercised, it is of no consequence that he was originally appointed by the compulsion of the statute. It seems to us that the only important inquiry, viz.: 'Are the substantial relations existing between the parties such as war dissolves?" is overlooked.

Judgment must be rendered for the defendant with costs.

NOTE. This case was affirmed in the supreme court of the United States, by a divided court. [Unreported.] The case of Hamilton v. Mutual Life Ins. Co. was also affirmed on appeal by the same divided court, which asserted a doctrine the opposite of that announced by Judge Emmons. [Unreported.]

[The following note to Smith v. Charter Oak Life Ins. Co. is reprinted from 1 Cent. Law J. 79, by permission, instead of the condensation of the same given in 1 Flip. 339:]

"The reasoning on which Judge Emmons proceeds is, that the keeping alive of such a contract is beneficial to the public enemy. This, it is admitted in the case of Sands v. New York Mut. Life Ins. Co., 50 N. Y. 632, would terminate the contract, if such were the case; but this is denied, especially when the policy contains a provision rendering it void if the assured shall enter the military or naval service, or die in the known violation of any law of the United States. Where the policy contains such a provision, Peckham, J., argues (50 N. Y. 635) that its perpetuation would be injurious to the public enemy. Again, Judge Emmons argues that the fact that the sum insured will not in any event be paid until after the return of peace, does not furnish any reason against the doctrine that such a contract is avoided by war; because, if continued, it remains 'one of the most certain sources of future payment which could be placed in the hands of our enemies.' It constitutes 'present capital in the hands of the enemy.' This argument is forcibly answered by Judge Blatchford in Hamilton v. Mutual Life Ins. Co. [Case No. 5,986], as follows: 'Nor is it perceived how the amount or value of a policy on the life of an alien enemy, who dies during the war, can be availed of to aid the war, by the government of the country of the assured, in any way, or to any extent, in or to which the amount or value of a promissory note, made before the war, and falling due during the war, can be availed of to aid the war, by the government of the country of its holder, while its maker continues to be an alien enemy. Yet it was never heard that the obligation to pay a note was, under such circumstances, or for such reasons, abrogated by a war.'

"Judge Emmons' opinion places the question entirely, as we understand it, upon grounds of public law, and political duty. In the Georgia case (44 Ga. 122), the same conclusion is reached on a somewhat different ground. McCay, J., pronouncing the judgment of the court, reasons as follows: 'It would have been illegal for Mrs. Dillard (the wife of the insured) to pay the premium to the company, during the war, contrary to the act of congress. And were this a case of forfeiture for a failure, we should hold that a forfeiture was prevented by the illegality of the performance of the condition. But is this such a case? The company contracts to pay so much at the death of the insured, if the annual premiums are paid as stipulated. It is clear from the policy, and from the known practice of all the companies, that the insured has a right, at any time, to refuse to pay, and give up his policy. The contract, upon its face, requires to be renewed from year to year, by the payment of the premium. Indeed, a contract of life insurance is, at best, nothing but an undertaking that the company will take the annual premiums paid, invest them safely, and pay the insured the product, after deducting the expenses of the business. Indeed, if every person insured lived to an average age, this would be exactly the contract. But, as any individual may die at any time, the company agree to pay him what his premium would amount to, making up its losses upon him by the payment of those who live beyond the average age. The regular annual payment of the premium agreed on is thus a condition precedent of the contract, and not a condition subsequent. And it is just here, that the authorities relied on fail to apply. If a condition subsequent becomes illegal, there is no forfeiture; for the estate having once vested, it shall not be divested because the party fails to do an illegal or impossible act. Code, § 2680. But it is different with a condition precedent. If that be illegal, the right never vests. It is not a question of forfeiture, but a failure to do the thing necessary to acquire the right. Broom, Leg. Max. 176. And this, it seems to me, is a distinction based upon principles of justice and

sound sense. If I promise a man to sell him my house, provided he appear on a particular day with the money, and he fails, for whatever reason, other than my fault, he has no right in the house. But if I sell him the house, and it is agreed that he shall forfeit it, if he fail to pay me for it in full, by a particular day, then the cause of his failure may, both in equity and sound sense, become very material.' On the other hand, in the case of Cohen v. New York Mut. Life Ins. Co., 50 N. Y. 623, we find the following counter reasoning: 'At the time of making the contract in this case, the plaintiff had the legal right and ability to make the annual payment, but the effect of the war was to make the attempt unlawful without any fault on his part. The operation of a condition as express and absolute as in this case, was held suspended during the war, in Semmes v. Hartford Ins. Co., 14 Wall. [81 U. S.] 158. The condition there, as here, was by the act and agreement of the party; and yet its performance being impossible, it was held to be inoperative.'

"The cases which hold that the contract of life insurance was not abrogated by the war, proceed chiefly upon the ground, that such a contract is in part executed by the payment of premiums; that by such payment, the beneficiary acquires a vested right in the benefits promised by the contract, of which he cannot be deprived by a casualty beyond his control, like the breaking out of a war. And some of the cases urge, in forcible language, that to hold the contract abrogated by the war, would be grossly unjust to the person for whose benefit the insurance is effected, and that such a defence on the part of the insurer, is an unconscionable defence. Thus, it is said in the Kentucky case: 'To subject to forfeiture all the premiums paid, as well as the five thousand dollars for the loss of life, would be harshly and unreasonably penal, for no better cause than the inevitable non-precise payment of premium, which the law prevented the appellant from a right to receive. * * * A suspension of the remedy, and not a dissolution of the contract, is all that is necessary, befitting or just.' New York Life Ins. Co. v. Clopton, 7 Bush, 184, 188. In the case of Hamilton v. Mutual Life Ins. Co. [supra] the question is put by Judge Blatchford in this way: 'The defendants in effect say to Goodman (the insured): "It was unlawful for us to receive from you your premiums for 1862, 1863, 1864, and 1865, as they became due; it would have been idle for you to have tendered them to us; yet as the contract was that you should pay them at specified times, the contract is forfeited; our liability to pay you the $5,983.05 is at an end, and besides that, the $2,307.50 paid us as premiums on the policies of 1849, and 1858, is forfeited to us." I do not believe a defence of that kind to a policy of life insurance situated like the present one, was ever allowed by any court of justice in any civilized community. I certainly shall not be the first judge to set a precedent of the kind.' Equally strong is the language of Anderson, J., speaking for a majority of the court in the Virginia case, where he states the case thus: 'They (the insurers) refused to receive the last premium when it fell due and was tendered, and now refuse to pay the policy because the premium was not paid; and, moreover, claim of the defendant in error a forfeiture of the premiums which he had paid, amounting to $5,155, besides interest; and they invoke the intervention of the court to sustain them in these pretensions. * * * It would be a monstrous perversion of law, and repugnant to our every sense of justice, to say that this company, after having received more than half the sum assured, could, by this act, determine the policy, hold on to the money they had received, and say to their confiding victim, "You may whistle to the winds for your merited reward, notwithstanding you relied upon our covenant, and good faith to pay it." '

"And while the court admit that this language puts the case too strongly, yet they say further on, that the proposition that the company could withhold from the agent the printed receipts by which payment of the premiums was to be acknowledged, 'would be to say that they could refuse to receive payment, and thereby release themselves from the obligation of the policy, and subject the assured to a forfeiture, without any default of his, of all the premiums he had paid—a conclusion against which the sense of mankind would revolt.'

"These extracts indicate, to a partial extent, the reasoning of the courts on the subject. The legal result of the recent adjudications may be summed up, as follows:

"1. The contract of life insurance is not abrogated, but only suspended, by the outbreak of a war which places the insurer and insured within opposing lines of belligerent occupancy. Smith v. Charter Oak Life Ins. Co., supra; Seyms v. New York Life Ins. Co. (U. S. Cir. Ct. S. D. Miss. Nov. Term, 1873; Hill, J.) [unreported]; Cohen v. New York Mut. Life Ins. Co., 50 N. Y. 610; Sands v. New York Life Ins. Co., Id. 626; Manhattan Life Ins. Co. v. Warwick, 20 Grat. 614 (two of the five judges dissenting); New York Life Ins. Co. v. Clopton, 7 Bush, 179; Hamilton v. Mutual Life Ins. Co. [supra]. Contra: Tait v. New York Life Ins. Co. (U. S. Cir. Ct. W. D. Tenn.; Emmons, J.) [Case No. 13,726]; Dillard v. Manhattan Life Ins. Co., 44 Ga. 119.

"2. If the stipulated premiums are paid until the outbreak of the war, but not thereafter, and the assured die during the war, the beneficiary or legal representative may, by giving notice and making proof of death within a reasonable time after the close of the war, demand and compel payment of the sum stipulated in the policy, less the unpaid premiums accruing previously to the death of the insured, with interest. Sands v. New York Life Ins. Co., supra; Seyms v. New York Life Ins. Co., supra; Manhattan Life Ins. Co. v. Warwick, supra (two of the five judges dissenting); Hamilton v. Mutual Life Ins. Co., supra; New York Life Ins. Co. v. Clopton, supra. Contra: Tait v. New York Life Ins. Co., supra; Dillard v. Manhattan Life Ins. Co., supra. And this principle applied to an insurance maintained by a creditor upon the life of his debtor. Manhattan Life Ins. Co. v. Warwick, supra.

"3. If the insured survives the war, and within a reasonable time thereafter the unpaid premiums accruing during the war are tendered by him, and the insurer declines to receive the same, or to acknowledge the policy as in force, the beneficiary in the policy may maintain a bill in equity to reinstate the contract and declare the rights of the parties. Cohen v. New York Mut. Life Ins. Co., supra.

"4. Or, under like circumstances, payment of the premiums having been tendered to, and refused by, the company's agent, during the war, the beneficiary may treat such refusal as a breach of the contract, and may maintain an action at law for damages; and the measure of damages is the value of the policy at the time of such breach of contract. Smith v. Charter Oak Life Ins. Co., supra (principal case).

"5. The relation of principal and agent between an insurance company residing within one of the lines of belligerent occupancy, and its agent residing within the other, is not terminated by the fact of war. Smith v. Charter Oak Life Ins. Co. (principal case) supra; Sands v. New York Life Ins. Co., supra; Hamilton v. Mutual Life Ins. Co., supra; Manhattan Life Ins. Co. v. Warwick, supra; New York Life Ins. Co. v. Clopton, supra. Contra, Tait v. New York Life Ins. Co., supra. And see Ward v. Smith, 7 Wall. [74 U. S.] 447, 452; U. S. v. Grossmeyer, 9 Wall. [76 U. S.] 72, 75. Provided, the agent had been appointed before the war. Id. 75.

"6. And it is the duty of the insurer to provide an agent in the state where the premiums,

by the terms of the policy, are to be paid; and this duty continues, notwithstanding the intervention of war. Hamilton v. Mutual Life Ins. Co., supra.

"7. Although an agent under such circumstances, would not have the power lawfully to enter into new contracts of insurance (New York Life Ins. Co. v. Clopton, supra; Ward v. Smith, 7 Wall. [74 U. S.] 452), nor to transmit money received for premiums across the hostile lines to his principal: yet he might lawfully receive premiums on policies in force before the war, and such the insured might lawfully pay (Manhattan Life Ins. Co. v. Warwick, supra; Sands v. New York Life Ins. Co., supra). At least, a tender to such an agent, and his refusal to receive the premium because of his inability to transmit the same to his principal because of the intervention of a state of war, would save a forfeiture of the policy. Hamilton v. Mutual Life Ins. Co., supra.

"8. Payment of premiums under such circumstances in Confederate money, is a good payment. Sands v. New York Life Ins. Co., supra. But the right of the company through its agent to refuse payment in such funds, is recognized in Manhattan Life Ins. Co. v. Warwick, supra."

[In New York Life Ins. Co. v. Statham, 93 U. S. 24, the supreme court of the United States, per Mr. Justice Bradley, held, in 1876, that if failure to pay the annual premium be caused by the intervention of war between the territories in which the insurance company and the assured respectively reside, which makes it unlawful for them to hold intercourse, the policy is, nevertheless, forfeited if the company insist on the condition; but in such case the assured is entitled to the equitable value of the policy, arising from the premiums actually paid.

[See, also, New York Life Ins. Co. v. Davis, 95 U. S. 425.]